### PENNOYER *v.* McCONNAUGHY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF OREGON.

No. 1280. Submitted January 5, 1891.—Decided April 20, 1891.

A suit in equity against the board of land commissioners of the State of
Oregon, brought by a purchaser of swamp and overflowed lands under
the act of October 26, 1870, in order to restrain the defendants from
doing acts which the bill alleges are violative of the plaintiff's contract
with the State when he purchased the lands, and which are unconstitu-
tional, destructive of the plaintiff's rights and privileges, and which it is
alleged will work irreparable damage and mischief to his property rights
so acquired, is not a suit against the State within the meaning of the
Eleventh Amendment to the Constitution of the United States.

The cases reviewed in which suits at law or in equity against officials of a
State, brought without permission of the State, have been held to be,
either suits against the State, and therefore brought in violation of the
Eleventh Amendment to the Constitution; or, on the other hand, suits
against persons who hold office under the State, for illegal acts done by
them under color of an unconstitutional law of the State, and therefore
not suits against the State.

The act of the legislature of Oregon of January 17, 1879, repealing the act
of October 26, 1870, concerning the swamp and overflowed lands, and
making new regulations concerning the same, did not invalidate an appli
cation, duly made before its passage, to purchase such lands; but such an
application could be perfected by making the payments required by the

act of 1870 after its repeal, but within the time prescribed by that act; and a title thus acquired is good against the State.

The act of the legislature of Oregon of February 16, 1887, declaring all certificates of sale of swamp or overflowed lands void on which twenty per cent of the purchase price was not paid prior to January 17, 1879, and requiring the board of commissioners to cancel such certificates, impaired the contract made by the State with the defendant in error under the act of October 26, 1870, as that act and the act of January 17, 1879, are construed by the court, and was therefore violative of article 1, section 10, of the Constitution of the United States.

THIS was a suit in equity by the appellee, a citizen of California, against the appellants, who, under the constitution of Oregon, as governor, secretary of state, and treasurer of state, comprised the board of land commissioners of that State, to restrain and enjoin them from selling and conveying a large amount of land in that State, to which the appellee asserted title. The lands are a portion of those granted to Oregon under the swamp land act of March 12, 1860, 12 Stat. 3, and are claimed by the appellee to have been sold by the State to one H. C. Owen, in 1881 and 1884, for a valuable consideration, in accordance with the provisions of an act of the State legislature approved October 26, 1870, from whom appellee derived title.

There was a demurrer to the bill, on the ground that the suit was practically against the State, and was, therefore, prohibited by the Eleventh Amendment to the Constitution. The demurrer was overruled by Judge Deady, January 28, 1890, his opinion being reported in 43 Fed. Rep. 196. On rehearing before the same judge August 18, 1890, the order overruling the demurrer was confirmed, 43 Fed. Rep. 339, and a decree entered perpetually enjoining the defendants from selling the lands in question, as prayed in the amended bill. An appeal from that decree brought the case here.

The material facts in the case, as presented by the amended bill and the demurrer, were as follows: Art. VIII, § 5, of the constitution of the State of Oregon, provides that "the governor, secretary of state, and state treasurer shall constitute a board of commissioners for the sale of school and university lands, and for the investment of the funds arising therefrom,

and their powers and duties are such as may be prescribed by law," etc. The act of the legislature of the State, approved October 26, 1870, provided a method for the disposal of the swamp and overflowed lands enuring to her under the act of March 12, 1860. By its first section it enacted that the commissioner of lands (who at that time was the governor of the State) should appoint a deputy or deputies to select all the swamp and overflowed lands in the field, describing each tract selected in a clear and distinct manner, either by legal subdivisions or by actual survey, and to make return of the same to the commissioner for examination. The act then provided as follows:

"Sec. 2. So soon as the selection of swamp and overflowed lands in any county has been completed by said Commissioner of Lands, it shall be the duty of said Commissioner to make out maps and descriptions thereof in duplicate, one copy to be kept in suitable books in his office, and the other to be filed in the office of the County Clerk of the county in which such swamp lands may be located; and it shall be the duty of such County Clerk to forward his official certificate to said Commissioner of the date on which said maps and descriptions were so filed. Upon the receipt of such certificate it shall be the duty of said Commissioner to give public notice of said completion, approval and filing, for four weeks successively in some weekly newspaper published in such county; and if no newspaper is published in such county, then in such newspaper as he may select in an adjoining county.

"Sec. 3. The swamp and overflowed lands of this State shall be sold by said Commissioner at a price not less than one dollar per acre in gold coin. Any person over the age of twenty-one years, and being a citizen of the United States, or having filed his declaration to become a citizen, as required by the naturalization laws, may become an applicant for the purchase of any tract or tracts of said swamp and overflowed lands upon filing his application therefor (describing the tract or tracts he desires to purchase), by the actual survey; or, if no survey has been made, then by fences, ditches, monuments or other artificial or natural landmarks, with said Commissioner,

whose duty it shall be to immediately endorse thereon the actual date of such filing. In case of adverse applicants for the same tract or parcel of swamp land, it shall be the duty of said Commissioner to sell the same to the legal applicant therefor, whose application is first filed. Within ninety days after the date of the public notice provided in section two of this act, twenty per centum of the purchase money shall be paid by the applicant to said Commissioner, whose duty it shall be to issue to the applicant a receipt therefor, and the balance of said purchase money shall be paid on proof of reclamation, as hereinafter provided.

"SEC. 4. No patent shall be issued to any applicant for any swamp or overflowed lands until the applicant therefor has proved, to the satisfaction of said Commissioner, that the land for which he claims a patent has been drained or otherwise made fit for cultivation; but upon such proof being made, and payment of the balance of the purchase money on the amount of land actually reclaimed, the said Commissioner shall issue to the applicant making such proof and payment, a patent for the land so reclaimed. Said patent shall be approved and signed by the Governor, Secretary of State and State Treasurer, as provided for by the Constitution. At the expiration of ten years from and after his first payment, all swamp lands claimed by an applicant, upon which no such proof of reclamation and payment has been made, shall revert to the State, and the money paid thereon shall be forfeited: *Provided*, That all swamp land which has been successfully cultivated in either grass, the cereals or vegetables for three years, shall be considered as fully reclaimed within the meaning of this act."

"SEC. 6. . . . *Provided*, That in case the office of Commissioner of Lands is not created by law, the provisions of this Act shall be executed by the Board of Commissioners for the sale of school and university lands." Session Laws, 1870, p. 54.

While this act was in force, to wit, at a date prior to October 18, 1878, Henry C. Owen made an application to purchase a large quantity of swamp lands from the State, including the lands in controversy, agreeably to the provisions

of the act; and on the 23d of November, 1881, and the 3d of April, 1884, within ninety days after the date of the public notice of the completion of the maps and description of the lands, provided for in the second section of the act, he paid to the board of commissioners, as required by the third section, the twenty per centum of the price of over forty-three thousand acres of land. Owen sold these lands to one Felton, who sold them to the plaintiff for the sum of $30,000, the latter also assuming to pay to the State the remainder of the purchase price when it became due.

After Owen made his application to purchase, as above mentioned, but before he had made the first payment, to wit, October 18, 1878, the legislature of the State passed an act which went into effect January 17, 1879, (ninety days after its date, as provided by the constitution of the State,) expressly repealing the aforesaid act of 1870, and making entirely new regulations for the disposition and sale of the swamp lands belonging to the State. Its ninth section was as follows: "All applications for the purchase of swamp and overflowed lands . . . made previous to the passage of this act, which have not been regularly made in accordance with law, or which were regularly made, and the applicants have not fully complied with all the terms and requirements of the law under which they were made, including the payment of the twenty per centum of the purchase price, are hereby declared void and of no force or effect whatever." Session Laws of 1878, pp. 41, 46.

February 16, 1887, the legislature of the State passed an act, the first section of which provided as follows: "All certificates of sale, issued by the board of commissioners for the sale of school and university lands and for the investment of the funds arising therefrom, for swamp or overflowed lands on which the twenty per centum of the purchase price was not paid prior to January 17, 1879, are hereby declared void and [of] no force or effect whatever; and said board of commissioners is hereby authorized and directed to cancel said certificates of sale." Session Laws of 1887, pp. 9, 10. The certificates of sale herein referred to were the receipts provided for in the third section of the act of 1870.

Acting under the provisions of the statute of 1887, the board of land commissioners cancelled the certificates of sale issued to Owen, as aforesaid, because the twenty per centum of the price of the land had not been paid prior to January 17, 1879, the date when the act of 1878 went into effect; and, claiming that said lands had reverted to the State, had ordered them to be sold, and had actually sold about 1000 acres of them under the act of 1887.

*Mr. Lewis L. McArthur* and *Mr. H. H. Northup* for appellants.

I. Owen never had a contract with the State which was protected by the Constitution of the United States. The act of October 26, 1870, was not a grant nor did it partake of the nature of a grant. It was a mere preëmption privilege. Such a privilege might be revoked by the State at any time before any actual consideration passed or before the person who had filed an application for purchase had entered upon or occupied the land or had begun the reclamation thereof. We contend that by simply applying to purchase swamp and overflowed lands under the act referred to, no such contract relations arose between the applicant and the State as are contemplated by the constitutional provision invoked by the appellee. In other words the act does not belong to that class of laws which can be denominated contracts, except so far as it has been actually executed and complied with.

By the act of 1878 a new method of disposing of the public lands of the State was established. Restrictions were placed upon the quantities of land to be purchased by any one applicant, the purchase price was changed, and protection was afforded actual settlers.

With the repeal of the act of 1870 Owen's mere naked application to purchase the lands in controversy was bereft of all legal life. No subsequent act on his part, of whatever nature, could restore it. Payment of the twenty per centum, at the time averred in the amended bill, gave him no right whatsoever to any of the lands and the acceptance of the

twenty per centum by the board of land commissioners was without authority of law and did not bind the State.

It is common learning that the authority of a public agent depends on the law as it is when he acts. He has only such powers as are specifically granted, and cannot bind the public under powers that have been taken away. *Anthony* v. *County of Jasper*, 101 U. S. 693; *Coler* v. *Cleburne*, 131 U. S. 162, 173.

Furthermore, as if to place this matter beyond all contention, section 9 of the act of 1878 declared that

" All applications for the purchase of swamp and overflowed lands, or tide lands, made previous to the passage of this act, which have not been regularly made in accordance with law, or which were regularly made, and the applicants have not fully complied with all the terms and requirements of the law under which they were made, including the payment of the twenty per centum of the purchase price, are hereby declared void and of no force or effect whatever."

The effect of this section was, as we contend, to require payment by Owen of the twenty per centum prior to January 19, 1879, the date when the act took effect. Nor does this construction of the section render it unconstitutional, as impairing the obligation of any contract which Owen had with the State, for the very obvious reason that he had acquired no vested rights under the alleged contract.

It is only vested rights growing out of contracts or growing out of transactions in the nature of contracts authorized by statute, that are protected by the constitutional provision invoked by the appellee. And the right must be so far perfected, as that nothing remains to be done by the party asserting it. Then only is it that the repeal of the statute does not affect the right. Then only is it that it becomes a vested right which stands independently of the statute. And so this court decided in *Steamship Company* v. *Joliffe*, 2 Wall. 450.

II. This suit, in substance and effect, is one against the State, and comes within the prohibition of the Eleventh Amendment to the Constitution. The appellants have no personal interest

in the controversy. They are sued in their representative capacity, as officers of the State. We claim that the State is, in a substantive sense, the actual party defendant, and, the State being within the constitutional exemption guaranteed by the Eleventh Amendment, the court below did not have jurisdiction. This principle was decided in *In re Ayers*, 123 U. S. 443, in which it was distinctly held that where a bill in equity is brought against the officers and agents of a State, the nominal defendants have no personal interest in the subject matter of the suit, and such bill, being for an injunction against such officers and agents to restrain and enjoin them from acts which it is alleged they threaten to do, in pursuance of a statute of the State, in its name and for its use, and which, if done, would constitute a breach on the part of the State of an alleged contract between it and the complainants, is a suit against the State within the meaning of the Eleventh Amendment, although the State may not be named as a party defendant.

*Mr. C. A. Dolph* and *Mr. C. R. Bellinger* for appellee.

MR. JUSTICE LAMAR, after making the foregoing statement, delivered the opinion of the court.

The contention of the complainant below was, that the act of 1887, under which the defendants below assumed to act, in the matter of the cancellation of his certificates of sale, was in violation of section 10, article I, of the Constitution of the United States, in that it impaired the obligation of the contract made between Owen and the State for the sale of the lands; that the defendants were, therefore, acting in the premises without authority of law; and that, for those reasons, it could not be asserted that the suit was against the State. The defendants, on the other hand, insisted that the aforesaid legislation was valid and constitutional; that the suit was, in effect, against the State; and that, therefore, the Circuit Court was forbidden to exercise jurisdiction in the matter by the Eleventh Amendment to the Constitution.

This appeal, therefore, involves the construction and appli-

cation of two distinct provisions of the Constitution which are
set up, one against the other, by the parties to the controversy,
in support of their respective contentions.　The complainant
below bases his claim for the relief prayed for upon that clause
of section 10, article I, which provides that " no State shall
pass any law impairing the obligation of contracts ; " whilst
the defendants below, the appellees, rely upon the Eleventh
Amendment to the Constitution, which declares that " the
judicial power of the United States shall not be construed to
extend to any suit in law or equity commenced or prosecuted
against any of the United States by citizens of another State,
or by citizens or subjects of a foreign State."

The question, then, of jurisdiction is first presented for de-
termination.　Is this suit, in legal effect, one against a State,
within the meaning of the Eleventh Amendment to the Con-
stitution ?　A very large number of cases involving a variety
of questions arising under this amendment have been before
this court for adjudication ; and, as might naturally be ex-
pected, in view of the important interests and the wide-reach-
ing political relations involved, the dissenting opinions have
been numerous.　Still the general principles enunciated by
these adjudications will, upon a review of the whole, be found
to be such as the majority of the court and the dissentients
are substantially agreed upon.

It is well settled that no action can be maintained in any
Federal court by the citizens of one of the States against a
State, without its consent, even though the sole object of such
suit be to bring the State within the operation of the constitu-
tional provision which provides that " no State shall pass any
law impairing the obligation of contracts."　This immunity
of a State from suit is absolute and unqualified, and the con-
stitutional provision securing it is not to be so construed as to
place the State within the reach of the process of the court.
Accordingly, it is equally well settled that a suit against the
officers of a State, to compel them to do the acts which con-
stitute a performance by it of its contracts, is, in effect, a suit
against the State itself.

In the application of this latter principle two classes of

cases have appeared in the decisions of this court, and it is in determining to which class a particular case belongs that differing views have been presented.

The first class is where the suit is brought against the officers of the State, as representing the State's action and liability, thus making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contracts. *In re Ayers*, 123 U. S. 443; *Louisiana* v. *Jumel*, 107 U. S. 711; *Antoni* v. *Greenhow*, 107 U. S. 769; *Cunningham* v. *Macon & Brunswick Railroad*, 109 U. S. 446; *Hagood* v. *Southern*, 117 U. S. 52.

The other class is where a suit is brought against defendants who, claiming to act as officers of the State, and under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the State. Such suit, whether brought to recover money or property in the hands of such defendants, unlawfully taken by them in behalf of the State, or for compensation in damages, or, in a proper case where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus, in a like case, to enforce upon the defendant the performance of a plain, legal duty, purely ministerial — is not, within the meaning of the Eleventh Amendment, an action against the State. *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Davis* v. *Gray*, 16 Wall. 203; *Tomlinson* v. *Branch*, 15 Wall. 460; *Litchfield* v. *Webster County*, 101 U. S. 773; *Allen* v. *Baltimore & Ohio Railroad*, 114 U. S. 311; *Board of Liquidation* v. *McComb*, 92 U. S. 531; *Poindexter* v. *Greenhow*, 114 U. S. 270.

It is not our purpose to attempt a review of all, or even many, of these decisions, as to do so intelligently would unnecessarily protract this opinion, and in this connection, would subserve no useful purpose. It will be sufficient, perhaps, to refer to some of those which this case most nearly resembles.

It is believed that the case before us is within the principles of the great and leading case of *Osborn* v. *Bank of the United States*, 9 Wheat. 738, the opinion in which was delivered by Chief Justice Marshall. That was a suit in equity, brought

in the Circuit Court of the United States for the District of Ohio, by the president, directors and company of the Bank of the United States, to restrain Ralph Osborn, auditor of the State of Ohio, from executing a law of that State which was in violation of, and destructive to, the rights and privileges conferred upon the complainants by the charter of the bank and by the Constitution of the United States. One of the leading inquiries in the case was, whether an injunction could be issued to restrain a person, who was a State officer, from performing an official act enjoined by the statute of the State. The question presented by that inquiry was discussed, in a masterly manner, on the assumption that the statute of the State was unconstitutional, and it was held that in such a case, grounds of equity interposition existing, injunction would lie.

With regard to the objection, that if any case was made by the bill, for the interference of a court of chancery, it was against the State of Ohio, and was, therefore, within the prohibition of the Eleventh Amendment, the court held that the exemption of the State from suability could not be pleaded by its officers when they were proceeded against for executing an unconstitutional act of the State. This question was discussed most thoroughly, in the light of the other provisions of the Constitution relating to the jurisdiction of the Federal courts, and the conclusion arrived at thus announced : " It was proper, then, to make a decree against the defendants in the Circuit Court, if the law of the State of Ohio be repugnant to the Constitution, or to a law of the United States made in pursuance thereof, so as to furnish no authority to those who took or to those who received the money for which this suit was instituted." 9 Wheat. 859.

The statute of Ohio, under which the defendant was acting, was then examined and found to be unconstitutional. The case may then be said to have fully established the doctrine that an officer of a State may be enjoined from executing a statute of the State which is in conflict with the Constitution of the United States, when such execution would violate and destroy the rights and privileges of the complainant.

The principle stated by Chief Justice Marshall, (in that case,)

that "in all cases where jurisdiction depends on the party, it is the party named in the record," and that "the Eleventh Amendment is limited to those suits in which the State is a party to the record," has been qualified to a certain degree in some of the subsequent decisions of this court, and now it is the settled doctrine of this court that the question whether a suit is within the prohibition of the Eleventh Amendment is not always determined by reference to the nominal parties on the record, as the court will look behind and through the nominal parties on the record to ascertain who are the real parties to the suit. *New Hampshire* v. *Louisiana*, and *New York* v. *Louisiana*, 108 U. S. 76; *In re Ayers, supra.*

But the general doctrine of *Osborn* v. *Bank of the United States*, that the circuit courts of the United States will restrain a state officer from executing an unconstitutional statute of the State, when to execute it would violate rights and privileges of the complainant which had been guaranteed by the Constitution, and would work irreparable damage and injury to him, has never been departed from. On the contrary, the principles of that case have been recognized and enforced in a very large number of cases, notably in those we have referred to, as belonging to the second class of cases above mentioned.

In *Davis* v. *Gray*, the State of Texas had granted to a railroad corporation of that State 16 alternate sections of land per mile along the line of the road which was thereafter to be located. The company surveyed the lands and located its road through them. After all those things had been done, the commissioner of the state land office, and the governor of the State, acting under the authority of a statute of the State, which had declared the lands forfeited to the State, were selling certain of the lands and delivering patents for them to the purchasers. At the suit of the receiver of the road, the Circuit Court of the United States enjoined them from interfering with the rights of the road in the premises, and selling and conveying its lands; and that decree was affirmed by this court. Some of the expressions in the opinion in that case were criticised in the subsequent case of *United States* v. *Lee*, 106 U. S. 196, 244, and also in *In re Ayers*, 123 U. S. 443, 487,

488, where the objectionable expressions were examined and held to have been mere *dicta*. It has not been overruled, however, but, on the contrary, it has been cited with approval and relied upon as authority in a number of subsequent cases; and the underlying principles of it are regarded as sound.

In *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541, the same principle was applied. In that case an injunction was issued by the Circuit Court of the United States, at the suit of the holder of certain bonds of the State of Louisiana, to restrain the board of liquidation of the State, composed of the governor and certain other state officers, from issuing certain of the same kind of bonds to liquidate a debt claimed to be due from the State to the Louisiana Levee Company, on the ground that such use would impair the securities of the complainant, and would thus be violative of the contract he had with the State; and that decree was affirmed by this court on appeal. In delivering the opinion of the court, Mr. Justice Bradley said: "The objections to proceeding against state officers by *mandamus* or injunction are: first, that it is, in effect, proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled, that when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such cases, the writs of *mandamus* and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the non-performance or violation of his duty, it will not prevent the issuing of the writ. An unconstitutional law will

be treated by the courts as null and void;" citing *Osborn* v. *Bank of the United States* and *Davis* v. *Gray.*

*Poindexter* v. *Greenhow* has been adverted to. That was an action in detinue against the treasurer of the city of Richmond, Virginia, for the recovery of an office desk which he had seized for delinquent taxes, in payment of which the plaintiff had duly tendered coupons cut from bonds issued by the State of Virginia, under the funding act of March 30, 1871, and made by that act receivable for all taxes due the State. The defendant, under color of office, as tax collector, and acting in the enforcement of a statute of the State passed in 1882, which forbade the receipt of the coupons for taxes, refused to receive such tender and made the seizure complained of. It was held by this court that the act of the General Assembly passed in 1882 was unconstitutional and void, because it was an impairment of the contract entered into between the State and its bondholders by the act of 1871; that being unconstitutional, it afforded no protection to the defendant; that the action was properly maintainable against him, as a wrongdoer; and that it was not an action against the State, in the sense of the Eleventh Amendment. The whole question was discussed most thoroughly by Mr. Justice Matthews, both on principle and authority, and the following from the opinion of the court, delivered by Mr. Justice Miller, in *Cunningham* v. *Macon & Brunswick Railroad*, 109 U. S. 446, 452, quoted with approval: "Another class of cases is where an individual is sued in tort for some act injurious to another in regard to person or property, to which his defence is that he has acted under the orders of the government. In these cases he is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him."

*Allen* v. *Baltimore & Ohio Railroad Company*, 114 U. S. 311, decided at the same time as *Poindexter* v. *Greenhow*, and on the authority of that case, was, in all essential features, similar to the case under consideration. In discussing the

remedy by injunction against officers of a State, in such cases, Mr. Justice Matthews, delivering the opinion of the court, relied largely upon *Osborn* v. *Bank of the United States; Board of Liquidation* v. *McComb; Davis* v. *Gray* and many other cases; and the language above quoted from *Board of Liquidation* v. *McComb* was quoted with approval.

The case of *McGahey* v. *Virginia*, 135 U. S. 662, 684, was a suit instituted in the Circuit Court of Alexandria, Virginia, in the name of the Commonwealth, against the defendant, under the act of May 12, 1887, for the recovery of taxes due from him, in payment of which coupons cut from the bonds of the State had been tendered and not accepted. Judgment for the State was rendered by the Circuit Court, which, on appeal, was affirmed by the Supreme Court of the State. Brought before this court on a writ of error, the judgment of the state court was reversed. This case, with seven others, reported under this title, grew out of the legislation of the State regarding coupons of the same character as those involved in the Virginia coupon cases. Mr. Justice Bradley, delivering the unanimous opinion of the court, after a full and exhaustive review and analysis of the decisions in those cases and others like them, presented a summary of the propositions established by those decisions which cannot be well abridged, as follows:

"First, That the provisions of the act of 1871 constitute a contract between the State of Virginia and the lawful holders of the bonds and coupons issued under and in pursuance of said statute;

"Second, That the various acts of the General Assembly of Virginia passed for the purpose of restraining the use of said coupons for the payment of taxes and other dues to the State, and imposing impediments and obstructions to that use, and to the proceedings instituted for establishing their genuineness, do in many respects impair the obligation of that contract, and cannot be held to be valid or binding in so far as they have that effect;

"Third, That no proceedings can be instituted by any holder of said bonds or coupons against the Commonwealth of Virginia, either directly by suit against the Commonwealth by

name, or indirectly against her executive officers to control them in the exercise of their official functions as agents of the State;

"Fourth, That any lawful holder of the tax-receivable coupons of the State, issued under the act of 1871 or the subsequent act of 1879, who tenders such coupons in payment of taxes, debts, dues and demands due from him to the State, and continues to hold himself ready to tender the same in payment thereof, is entitled to be free from molestation in person or goods on account of such taxes, debts, dues or demands, and may vindicate such right in all lawful modes of redress, — by suit to recover his property, by suit against the officer to recover damages for taking it, by injunction to prevent such taking where it would be attended with irremediable injury, or by a defence to a suit brought against him for his taxes or the other claims standing against him."

The dividing line between the cases to which we have referred and the class of cases in which it has been held that the State is a party defendant, and, therefore, not suable, by virtue of the inhibition contained in the Eleventh Amendment to the Constitution, was adverted to in *Cunningham* v. *Macon & Brunswick Railroad*, where it was said, referring to the case of *Davis* v. *Gray, supra: "Nor was there in that case any affirmative relief* granted by ordering the governor and land commissioner *to perform any act towards perfecting the title of the company."* 109 U. S. 453, 454. Thus holding, by implication, at least, that affirmative relief would not be granted against a State officer, by ordering him to do and perform acts forbidden by the law of his State, even though such law might be unconstitutional.

The same distinction was pointed out in *Hagood* v. *Southern*, which was held to be, in effect, a suit against the State, and it was said: "A broad line of demarcation separates from such cases as the present, in which the decrees require, *by affirmative official action* on the part of the defendants, *the performance of an obligation which belongs to the State in its political capacity,* those in which actions at law or suits in equity are maintained against defendants who, while claiming to act as officers of the State, violate and invade the personal and prop-

erty rights of the plaintiffs, under color of authority, unconstitutional and void." 117 U. S. 52, 70.

The cases in which suits against officers of a State have been considered as against the State itself, and, therefore, within the inhibition of the Eleventh Amendment to the Constitution, and those in which such suits were considered to be against state officers, as individuals, were elaborately reviewed and distinguished in the recent case of *In re Ayers,* 123 U. S. 443. That case came before us on application for *habeas corpus* by the attorney general of Virginia, the auditor of the State, and the commonwealth's attorney for Loudoun county in that State, who were in the custody of the United States marshal for the Eastern District of Virginia, for contempt of court, in disobeying a restraining order of the Circuit Court of the United States for that district, commanding them not to institute and prosecute certain suits in the name of the State of Virginia, required to be brought by the statutes of the State. The suit in which the restraining order was issued was nominally against certain officers of the State, but this court held that it was, in effect, a suit against the State itself, and, therefore, in violation of the Eleventh Amendment to the Constitution. And that such being true, the acts and proceedings of the Circuit Court in that suit were null and void for all purposes; and the prisoners were discharged. In delivering the opinion of the court, Mr. Justice Matthews, referring to the class of cases in which it had been adjudged that the suit was against state officers in their private capacity, and not against the State, said : " The vital principle in all such cases is that the defendants, though professing to act as officers of the State, are threatening a violation of the personal or property rights of the complainant, for which they are personally and individually liable. . . . This feature will be found, on an examination, to characterize every case where persons have been made defendants for acts done or threatened by them as officers of the government, either of a State or of the United States, where the objection has been interposed that the State was the real defendant, and has been overruled." 123 U. S. 500, 501.

In *Hans* v. *Louisiana*, 134 U. S. 1, 20, 21, the general rule on this subject was concisely stated by Mr. Justice Bradley in the following terms: "To avoid misapprehension it may be proper to add that, although the obligations of a State rest for their performance upon its honor and good faith, and cannot be made the subjects of judicial cognizance unless the State consents to be sued, or comes itself into court; yet where property or rights are enjoyed under a grant or contract made by a State, they cannot wantonly be invaded. Whilst the State cannot be compelled by suit to perform its contracts, any attempt on its part to violate property or rights acquired under its contract, may be judicially resisted; and any law impairing the obligation of contracts under which such property or rights are held is void and powerless to affect their enjoyment."

.Little remains to be done or said by us in this connection, except to apply the principles announced in the cases we have attempted to review to the facts in the case before us, as set forth in our introductory statement. In this connection it must be borne in mind that this suit is not nominally against the governor, secretary of state, and treasurer, as such officers, but against them collectively, as the board of land commissioners. It must also be observed that the plaintiff is not seeking any affirmative relief against the State or any of its officers. He is not asking that the State be compelled to issue patents to him for the land he claims to have purchased, nor is he seeking to compel the defendants to do and perform any acts in connection with the subject matter of the controversy requisite to complete his title. All that he asks is, that the defendants may be restrained and enjoined from doing certain acts which he alleges are violative of his contract made with the State when he purchased his lands. He merely asks that an injunction may issue against them to restrain them from acting under a statute of the State alleged to be unconstitutional, which acts will be destructive of his rights and privileges, and will work irreparable damage and mischief to his property rights. The case cannot be distinguished, in principle, from *Osborn* v. *Bank of the United States, Davis* v. *Gray*,

*Board of Liquidation* v. *McComb* and *Allen* v. *Baltimore & Ohio Railroad Co.*, cited above, and the reasoning in those cases applies with equal force in this. The essential difference between these cases and the case of *In re Ayers*, upon which the appellants mainly rely, was pointed out in the last-named case, and need not be adverted to further in this connection. We think it clearly demonstrated from the authorities above referred to that the relief prayed can be granted, if, as is contended for, the legislation of the State under which the defendants are assuming to act is unconstitutional, in that it operates to impair the obligation of a contract. And this leads to a consideration of that legislation with respect to that contention.

The position of the complainant below is, that, as the swamp lands of the State were for sale upon the terms and conditions mentioned in the act of 1870, a valid contract, binding upon both parties to it, was completed between the State and the applicant the moment a legal application to purchase was filed with the proper officer of the State and accepted by him. This was the view taken by the Circuit Court.

We quote from the opinion of Judge Deady as follows: "The transaction, as set forth in the statute, has all the elements of a contract of sale. The statute is a formal, standing offer by the State of these lands for sale, on the terms therein mentioned, and an invitation to all qualified citizens of the United States to become purchasers thereof by filing an application for some specific tract thereof with the board, and complying with the subsequent conditions of payment and reclamation. The application is a written acceptance of the offer of the State, in relation to the land described therein, and, on the filing of the same, the minds of the seller and the purchaser — the State and the applicant — came together on the proposition, and thenceforth there was an agreement between them for the sale and purchase of that parcel of land, binding on each of them, until released therefrom by some substantial default of the other, not overlooked or excused." 43 Fed. Rep. 202.

We think this view very forcible, and it would be conclusive

to our minds but for the consideration which suggests itself that the bare application itself, unaccompanied by the payment of any consideration, partakes somewhat of the nature of a preëmption claim under the laws of the United States, with reference to which it has been held that the occupancy and improvement of the land by the settler, and the filing of the declaratory statement of such fact, confers no vested right upon him, as against the government of the United States, until all the preliminary acts prescribed by law, including the payment of the price, are complied with. *Yosemite Valley Case,* 15 Wall. 77; *Frisbie* v. *Whitney,* 9 Wall. 187.

But we do not deem it necessary to determine whether the court was correct in that view of the case, for, in our opinion, another element of the case is of sufficient importance to control its disposition. Even if no vested right accrued to the applicant immediately upon the filing of his application and its acceptance by the authorities of the State, it is conceded on all hands that he acquired such a right upon the payment of the twenty per centum of the purchase price of the lands embraced in his application, if such payment was made in accordance with law. The defendants contend that the payments in this case were not made in accordance with law, because they were not made until after the act of October 18, 1878, went into effect, which act not only expressly repealed the act of 1870, under which the sale to Owen was made, but, in its ninth section, provided as follows: " All applications for the purchase of swamp and overflowed lands, . . . made previous to the passage of this act, which have not been regularly made in accordance with law, or which were regularly made, and the applicants have not fully complied with all the terms and requirements of the law under which they were made, including the payment of the twenty per centum of the purchase price, are hereby declared void and of no force or effect whatever." The argument is, that the applicant had not fully complied with the law of 1870, " including the payment of the twenty per centum of the purchase price " of the lands embraced in his application, previous to the passage of this act, and that, therefore, under the act, his application be-

came null and void.   On the other hand, it is insisted with
equal earnestness that the applicant had done all in his power
to complete his application, prior to the act of 1878, and was
only prevented from doing so and paying the first instalment
of the purchase money, by reason of the delay on the part of
the officers of the State, in performing the duties imposed
upon them by the act of 1870; that the ninety days after the
publication of notice of the completion, approval and filing of
the maps and description of lands, provided for by the second
section of the act of 1870, within which, under the third sec-
tion of the act, the applicant was required to pay the first
instalment of the purchase money, did not expire until long
after the act of 1878 went into effect; that within said ninety
days the applicant paid, and the commissioner received, the
twenty per centum of the purchase price of the land embraced
in his application; and that, by reason of the premises and for
the further reason that, until now, the act of 1878 had never
been considered as nullifying applications such as the one
under consideration, the application of Owen should be held
good and valid, and operative to vest in the applicant an inde-
feasible right and title to the lands in dispute.

There is some force in both of these contentions.   But it
seems to be conceded that, as stated in the opinion of Judge
Deady, from the passage of the act of 1878 until the enact-
ment of the statute of 1887, the construction put upon the
former act was in harmony with that claimed by the plaintiff
in this case.   The act does not appear to have ever received a
construction at the hands of the Supreme Court of the State;
but the board of land commissioners, whose duty it was to
administer the swamp land grant on behalf of the State, always
followed that construction.   A copy of an opinion of the board,
delivered a few years after the passage of the act of 1878, on a
contest involving other lands similarly circumstanced, between
Owen and a party claiming that Owen's right had become for-
feited, under the act of 1878, for his failure to pay the twenty
per centum of the purchase price of the lands prior to the
passage of that act, is set forth in the brief of counsel for
appellee.   That opinion is admitted by counsel for appellants

to have been delivered by the board, and the copy is not controverted. It is as follows: "The act of 1878 does not, however, attempt to interfere with applicants who had complied with the law of 1870. Section 9 of that act provides that 'all applications for the purchase of swamp land made previous to the passage of this act [act of 1878] which have not been regularly made in accordance with law, or which were regularly made, and the applicants have not fully complied with all the terms and requirements of the law under which they were made, including the payment of the twenty per centum of the purchase price, are hereby declared void and of no force or effect whatever.' A strict construction of this language might have the effect to forfeit all applications where the twenty per centum had not been paid, although the applicant had fully complied with the law as far as the circumstances would admit of a compliance. We have had occasion to consider that question frequently, and have concluded that it ought not to receive that construction. The legislature may have had the power to suspend every application of that character and declare it a nullity, but we do not think it so intended; that it only intended to declare void those applications where the non-payment of the twenty per centum had been a violation of the condition contained in the act of October 26, 1870. In many cases the applicant to purchase under the latter act was not in default when it was repealed, although he had not paid the twenty per centum [of the] purchase price, as the circumstances had not arisen or the time elapsed requiring its payment."

In *Corpe* v. *Brooks*, 8 Oregon, 222, 223, 224, the powers and duties of the board of commissioners were defined by the Supreme Court of the State in the following language: "This board was created by the state constitution and by it invested with the power to dispose of these State lands, and its powers and duties are such as are provided by law. It is composed of the governor, secretary of state and state treasurer, and is a part of the administrative department of the government, and exercises its powers independent of the judiciary department, and its decisions are not subject to be reversed by the

court. It occupies in this State the same relation to the state judiciary as the land department of the United States does to the United States courts, and their decisions have not been the subject of review by the United States courts."

The principle that the contemporaneous construction of a statute by the executive officers of the government, whose duty it is to execute it, is entitled to great respect, and should ordinarily control the construction of the statute by the courts, is so firmly imbedded in our jurisprudence, that no authorities need be cited to support it. On the faith of a construction thus adopted, rights of property grow up which ought not to be ruthlessly swept aside, unless some great public measure, benefit or right is involved, or unless the construction itself is manifestly incorrect. We do not think the construction of the act of 1878 by the board of commissioners is subject to either of these objections. The board evidently went upon the theory that the applicant to purchase land from the State, under the act of 1870, acquired by his application some sort of a property right, at least, that was not defeated by a repeal of the statute under which he applied; that if his right was not defeated by the repeal of the statute, he certainly ought to be allowed to go on and complete it according to the terms of the act, even though it had been repealed in the meantime; and that the ninth section of the act of 1878, therefore, did not nullify applications for the purchase of land from the State when the twenty per centum of the purchase price had not been paid prior to its going into effect. It is not straining that section to rule, as did the board of land commissioners, that "it only intended to declare void those applications where the non-payment of the twenty per centum had been a violation of the condition contained in the act of October 26, 1870." That section declares, among other things, that all applications for the purchase of swamp lands made previous to the passage of that act in which the applicants had not fully complied with all the terms and requirements of the law of 1870, including the payment of the twenty per centum of the purchase price, should be declared void, etc.

We think there were strong reasons for the view taken by

the board of land commissioners that the phrase "including the payment of the twenty per centum of the purchase price" had reference to a condition prescribed by the act of 1870; and that what the legislature intended thereby was, that all applications should be void in which the applicant had not paid the twenty per centum of the price, *in accordance with the terms* of the act of 1870. That is to say, one of the terms or conditions of the act of 1870, prescribed by its third section, was, that the applicant should pay the twenty per centum of the purchase price within a specified time, viz., ninety days after the notice of the completion, approval and filing of the map and description of the land; and if he had not complied with that condition his application was nullified by the ninth section of the act of 1878. The State had the right to contract for the sale of its swamp lands, and in the enforcement of its contract it had the right to insist upon a full compliance with the terms of the contract on the part of the applicant. It had the right to make the time of payment of the essence of the contract, and we are not prepared to say it did not do so. This reasoning leads logically to the conclusion that the ninth section of the act of 1878 was not intended to render void applications to purchase in which every condition of the act of 1870 had been complied with so far as lay in the power of the applicant, and where the failure to make the payment specified was caused solely by the failure of the other contracting party. We therefore accept the construction of the act of 1878 adopted by the board of land commissioners, and acted upon for so long a period of time in the administration of the swamp land grant, and hold that the application of Owen, in this case, was not rendered void by the act of 1878; and that, by the subsequent payment of the first instalment of the purchase price of the land embraced in his application, he acquired a vested right to those lands. In other words, by such payment, this contract with the State became so far executed as to be embraced in the class of contracts protected by § 10 of Art. 1 of the Constitution of the United States, which declares that "no State shall pass any law impairing the obligation of contracts."

Does the statute of 1887, above quoted, impair such a contract? We think it does, beyond all doubt. It, in so many words, authorizes the board of commissioners to cancel the certificates of sale where the twenty per centum of the purchase price of the land had not been paid prior to January 17, 1879, and treats the lands embraced in such certificates as reverted to the State. That legislation surely impaired the obligation of the contract Owen had with the State, for its effect was to destroy valuable property, rights and privileges belonging to him. It was, therefore, violative of the Constitution of the United States. Art. 1, § 10.

That statute being the one under which the appellants assumed to act, affords them no security or immunity for the acts complained of; and it cannot be said, therefore, that this is a suit against the State, within the meaning of the Eleventh Amendment.

*Decree affirmed.*