PRESIDENT, ETC., OF YALE COLLEGE v. SANGER, State Treasurer.

(Circuit Court, D. Connecticut. June 26, 1894.)

1. FEDERAL COURTS—JURISDICTION—SUIT AGAINST STATE OFFICER.

A federal court cannot take jurisdiction of a suit against a state officer to compel or coerce the state to perform its obligations or abide by its contracts, when the officer has neither committed nor threatened to commit an injury to the property of complainant, but may take jurisdiction of a suit against an officer who, under the authority of an unconstitutional statute, has attacked or threatened to attack and injure the vested pecuniary rights of complainant in his property.

2. AGRICULTURAL COLLEGE LAND SCRIP — VESTED INTEREST — INJUNCTION TO PREVENT DIVERSION OF INCOME.

The title which Yale College has under the contract with the state of Connecticut inviolably securing to said corporation the income of the fund (Act June 24, 1863) derived from the avails of land scrip donated under the act of congress of July 2, 1862, which were invested in bonds and constituted a separate fund, is a vested beneficial right in such securities, and the state treasurer may be enjoined, at the suit of the college in a federal court, from a threatened diversion of the income under the authority of an unconstitutional state statute, but will not be compelled to pay the income to the college, as such relief is, in effect, an attempt to compel the state to execute its contract.

This was a suit by the president, etc., of Yale College, against the state treasurer of the state of Connecticut, to prevent a threatened diversion from complainant of the income of the "Agricultural College Fund," created by act of congress. Defendant demurred to the bill.

Charles R. Ingersoll and Bristol, Stoddard & Bristol, for complainant.

Wm. Edgar Simonds and E. Henry Hyde, Jr., for defendant.

SHIPMAN, Circuit Judge. The matter in dispute between the parties arises under the laws of the United States. The complainant states in its bill in equity the following case:

(1) In 1863 the state of Connecticut received from the United States government, under the act of congress of July 2, 1862, land scrip subsequently sold for $135,000, "for the uses and purposes prescribed in said act." The prescribed "uses and purposes" was the investment of the money as "a perpetual fund," of which the interest was to be inviolably appropriated to the "endowment, maintenance, and support" of some college or colleges in Con-

necticut (to be provided by the state within five years), where the leading object should be to teach certain branches of learning relating to agriculture and the mechanic arts.

(2) The state of Connecticut, having accepted the donation "upon the terms contained in said act," thereupon, within the five years, selected the college of the complainant for the endowment provided by the act of congress, and by act of its general assembly of June 24, 1863, set apart the fund (subsequently styled the "Agricultural College Fund") for the purpose of such endowment, placing it in the special custody of the commissioner of the school fund, and appropriating the whole interest accruing therefrom thereafter to the complainant, in consideration of the complainant's engagement, by contract in writing, to fulfill the duties and perform the obligations required by the act of congress.

(3) The complainant complied with this condition of the endowment, and, "at large expense," equipped the department of its college known as the "Sheffield Scientific School" with the means of the prescribed instruction; and thereupon the college of the complainant became established, under the provisions of the act of congress, as the sole college in Connecticut entitled to the benefits of the endowment fund; and the complainant at once became possessed of the entire beneficial interest in said fund for the "endowment, maintenance, and support" of its college so established, and thereafter, down to the time of the threatened acts of the defendant complained of, has continued to enjoy for that purpose all the rights, privileges, and benefits belonging to such beneficial interest.

(4) By act of congress approved August 30, 1890, the United States government appropriated out of the United States treasury other sums, payable thereafter annually, for "the more complete endowment and support of the colleges for the benefit of agriculture and the mechanic arts established under the provisions of an act of congress approved July 2, 1862," which sums were directed to be paid by the secretary of the treasury of the United States to the state treasurer (in the absence of other designation by the state), by whom said sums were directed to be paid over "immediately" to the treasurers of the college entitled to receive the same; and, under the provisions of this act, such appropriations for the respective years ending June 30, 1890, June 30, 1891, June 30, 1892, June 30, 1893, were received by the state treasurer of Connecticut, and by him immediately paid over to the treasurer of this complainant, as the party entitled to receive the same for the benefit of its college "established" and "endowed" under the act of congress of July 2, 1862, as already stated.

(5) At the bringing of this suit, the defendant, being the state treasurer of Connecticut, had in his hands ——— dollars, which he had received from the commissioner of the school fund, as interest accrued from the agricultural college fund in the custody of said commissioner, and which, by the Connecticut act of June 24, 1863, had been granted to this complainant, as already stated, and had then by said act become payable to the complainant. The defendant also had in his hands the sum of $19,000, which he had received from the secretary of the treasury of the United States under the act of congress of August 30, 1890, and which, by said act of congress, he was directed to pay over immediately to this complainant, if the complainant was entitled to the same.

(6) The defendant, having these sums of money in hand, refused to pay over either of them to the complainant, and threatened to pay over the same, or the substantial part thereof, to the Storr's Agricultural College, an institution of the state of Connecticut, established by act of its general assembly approved April 21, 1893; his reason for such refusal and such threatened action being that he was directed so to do by the said act of the general assembly of the state.

(7) The complainant, claiming that by the act of congress of July 2, 1862, and the act of the general assembly of Connecticut of June 24, 1863, pursuant thereto, a property right in "the perpetual fund" by said acts constituted, had vested in the complainant by the grant or executed contract of the state of Connecticut, entitling the complainant to all the beneficial interest of said fund for the endowment of its college, established under said act of

congress, and also to all the sums of money appropriated by the act of congress of August 30, 1890, for the more complete endowment of its college so established, which vested property right cannot be annulled or impaired by any act of the general assembly of the state, and of which the complainant cannot be divested otherwise than by some due process of law, brings this suit against the defendant to prevent his threatened violation of the complainant's rights, as aforesaid, and his threatened injury to the complainant's property by depriving its college of the means of maintenance and support provided by its endowment under the acts of congress, and to require the defendant to perform towards the complainant the duty imposed upon him by the law, of paying over to the complainant the sums of money in question, as would have been his duty had the wrongful and unconstitutional action of the general assembly of Connecticut of April 21, 1893, not been had.

The defendant has demurred to the bill, upon the ground that it is, upon its face, in effect, a suit by the complainant against the state of Connecticut, and not against the defendant, except as, in his official capacity, he represents said state; and that the bill, therefore, upon its face, does not state a case which entitles the complainant to relief against the defendant. The immunity of the state from suit by an individual was the substantial question which was presented upon the argument. That a state cannot, without its consent, be sued in a circuit court of the United States by one of its own citizens, upon a suggestion that the case arises under the constitution or laws of the United States, and therefore cannot be coerced or compelled by suit of one of its citizens to perform its contracts, was decided in Hans v. Louisiana, 134 U. S. 1, 10 Sup. Ct. 504. It is equally well settled that an officer of the state who, as an aggressor, invades the property or vested pecuniary rights of an individual in his specific real or personal property, cannot, in a suit at law against him for his tort, or in a bill in equity to restrain the commission of the intended injury, when adequate relief cannot be otherwise afforded, successfully justify his conduct upon the ground that he is acting in obedience to the authority of an unconstitutional statute of the state. In the infinite variety of circumstances which arise in modern legislation, the question whether the state is the only aggressor often becomes a puzzling one, and the injured citizen is tempted to undertake to seek relief by making an officer the defendant, when he has committed no aggressive act upon the complainant's specific property. The distinction which runs through the cases, and which differentiates the class in which attempt has been made to coerce the state by compelling its officers to affirmatively perform the state's obligations, from the class which seeks to restrain the officer from committing an aggressive injury, under the pretended authority of an unconstitutional statute, upon the rights of an individual in his specific property, is stated in Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, one of the last cases which came before the supreme court upon this subject. The court says that suits of the second class are not within the meaning of the eleventh amendment,—"Actions against the State,"—and further defines the second class as follows:

"The other class is where a suit is brought against defendants who, claiming to act as officers of the state, and under the color of an unconstitutional

statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the state. Such suit, whether brought to recover money or property in the hands of such defendants, unlawfully taken by them in behalf of the state, or for compensation in damages, or in a proper case, where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus, in a like case, to enforce upon the defendant the performance of a plain, legal duty, purely ministerial, is not, within the meaning of the eleventh amendment, an 'action against the state.' "

Examples of the two classes are given with clearness in the opinion of the court, and perhaps ought not to be restated here, but a knowledge of the facts in the respective cases greatly tends to an understanding of the meaning of the general expressions which are used in the various opinions of the supreme court, and which without such knowledge might seem to be inharmonious.

In the case of Osborn v. Bank, 9 Wheat. 738, a case which still maintains its original importance, the power of the circuit court of the United States for the district of Ohio to restrain, by injunction, an officer of the state of Ohio from levying upon the property of a corporation, in order to enforce the collection of an unconstitutional state tax upon the corporation, was sustained. In Davis v. Gray, 16 Wall. 203, the same restraining power was upheld which had been exercised by the circuit court to prevent the officers of a state from selling the real estate of a railroad company, which the state had, in violation of its contract, declared to be forfeited.

In Board v. McComb, 92 U. S. 531, the state of Louisiana, in violation of a prior contract with the holders of the "consolidated bonds" of the state, had passed an act authorizing the board, having charge of the bonds, to issue a portion of them in liquidation, at par, of a debt which was not one of those for the founding of which the bonds had been issued. The original statute, also, provided that the new bonds were to be exchanged for specified bonds and warrants, at the rate of sixty cents in the new bonds for one dollar in the pre-existing securities. Upon a bill in equity by a holder for value of the new bonds to restrain the board from using any consolidated bonds, as proposed, the supreme court was of opinion that inasmuch as the threatened action destroyed "all the benefits anticipated from the funding, on which benefits those who accepted its terms had a right to rely," and injured the pecuniary rights of the complainant, an injunction, so far as it restrained the funding of the debt in consolidated bonds, was properly granted.

In the case of Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962, which was most elaborately discussed both at the bar and by the court, the court directed judgment for the plaintiff, in an action of detinue for personal property distrained by the defendant, an officer of the state of Virginia, "for delinquent taxes, in payment of which the plaintiff had duly tendered coupons cut from bonds issued by the state of Virginia," which were by the funding act of 1871 receivable in payment of taxes, and held that the subsequent act of the state which forbade the receipt of the

coupons for taxes was "a violation of the contract, and void as against coupon holders," and furnished no defense to the officer of the state for his seizure and sale of the plaintiff's property.

So, also, in Allen v. Baltimore & O. R. Co., one of the series of "Virginia Coupon Cases," 114 U. S. 311, 5 Sup. Ct. 925, 962, where the injured taxpayer became complainant in a bill in equity, the court sanctioned the remedy by injunction to prevent the officers of Virginia from collecting taxes by distraint upon the personal property of the complainant, "after a tender of payment in tax-receivable coupons."

The facts in Pennoyer v. McConnaughy, supra, are of marked importance in the ascertainment of the proper line of demarkation between suits nominally against officers of a state, but actually against a state, and suits properly brought against officers to prevent the threatened commission of injuries to the property of the plaintiff. The complainant had, under an existing statute of Oregon, acquired the right to purchase, upon specified terms, a described tract of swamp or overflowed land, belonging to the state. A subsequent statute declared certificates of sale of such lands, on which 20 per cent. of the purchase price was not paid prior to a named date, to be void, and required the board of commissioners to cancel them. The board threatened to sell the land described in the complainant's certificate. The supreme court, after holding that the new statute, under which the board was proceeding to act, impaired the contract theretofore made with the complainant, and that, under the facts of the case, he had a vested right to the land, held that a suit in equity, brought by him against the members of the board to restrain them from selling the tract to which he had acquired the equitable right, was not a suit against the state.

The important examples of cases which are suits against a state, and in which the complainants have sought to compel the performance of contracts by the state under the form of suits against the officers, present, with perhaps a single exception, a more complex state of facts. That exception is the case of Cunningham v. Railroad Co., 109 U. S. 446, 3 Sup. Ct. 292, 609, in which the complainants desired to foreclose a mortgage upon a railroad, and, for that purpose, to set aside a prior sale of the railroad to the state of Georgia, under a foreclosure of the first mortgage, the railroad being in possession of the state by virtue of its purchase. This was obviously a suit against the state, and not against the officers who were made nominal parties thereto.

The case of Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128, presents the following state of facts: Louisiana stipulated, by act of 1874, with the holders of the new bonds which were described in Board v. McComb, supra, and which were issued in exchange for valid outstanding bonds, that an annual tax of 5½ mills should be levied, and the income therefrom applied to the payment of the new bonds and coupons, and no further authority than that contained in the act should be required to enable the taxing or the disbursing officers to proceed. Owners of bonds demanded

of the state officers payment of the coupons which fell due January 1, 1889. Payment was refused on the ground that it was forbidden by an ordinance of the constitution of 1879. Certain bondholders brought an action at law for a mandamus, and a bill in equity for an injunction, forbidding the members of the board of liquidation to recognize as valid the ordinance. It will be seen that the members of the board had not moved against the bondholders, and that no particular act was asked to be performed by the board, but the court was asked to direct that the proper officers should administer the finances of the state in accordance with the act of 1874, and in that way to bring about payment of the bonds; and, further, it will be observed that there was no special fund which belonged to the bondholders. All the funds in the treasury were commingled, and were the property of the state, without an equitable lien thereon or title thereto on the part of any bondholder, and no duty was imposed upon the board "to separate from the other money in the treasury that realized from the taxes in question, and to hold it in trust for the bondholders." The court held "that the money in the treasury of Louisiana is her property, held by her officers, not in trust for her creditors, nor as their agents; and that the courts cannot control them in the administration of her finances, and thus oust the jurisdiction of the political power of the state." In this decision there was no undue refinement because the complainants were compelled to proceed upon the theory that a federal court could direct the officers of the state in respect to the management of the general funds of the state, no special duty having been imposed upon them by contract to keep any portion of the fund reserved for the bondholders. The bill was not an attempt to prevent an aggressive act by an officer of the state upon the complainant's property, which impaired its value.

The kernel of the decision in Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608, is thus stated in the syllabus: "State scrip which declares on its face that it is receivable," in payment of all taxes and dues to the state, "gives the holder no right to maintain a suit to compel its receipt for taxes, unless he owes the taxes for which it is receivable." The contract is with the holder, who is also a taxpayer, and who undertakes to pay his taxes with the scrip; and, if the scrip is refused, the contract is then, and not previously, broken. "The discredit cast upon the scrip by the general refusal to accept it by the tax collectors of the state, and the depreciation in value occasioned thereby, are not actionable injuries." The bill was brought to accomplish the general purpose of rectifying the legislation of South Carolina in regard to this scrip, and not to ward off the injury to be inflicted upon any one taxpayer; and, in view of this distinction, the court say:

"A broad line of demarkation separates from such cases as the present, in which the decrees require, by affirmative official action on the part of the defendants, the performance of an obligation which belongs to the state in its political capacity, those in which actions at law or suits in equity are maintained against defendants who, while claiming to act as officers of the state, violate and invade the personal property rights of the plaintiff, under color of authority, unconstitutional and void."

A case of very great importance is In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, because it embodies the principles contained in the two cases which were last cited, and because the facts bring it into marked distinction from those in the case of Allen v. Baltimore & O. R. Co., supra, which sanctioned an injunction at the suit of a taxpayer against proposed illegal distraints of his property; and it shows with considerable plainness the line which divides the two classes of which I have spoken. The original proceeding was a bill in equity by aliens, subjects of Great Britain, in behalf of themselves and all others similarly situated, against the auditor and attorney general of Virginia, the treasurers and the commonwealth attorneys of counties, cities, and towns in Virginia. The complainants, the owners of bonds, the coupons of which were to be received for payment of taxes, sought to enjoin the defendants from bringing suits "against taxpayers reported to be delinquent, but who had tendered, in payment of the taxes sought to be recovered in such suits, tax-receivable coupons, cut from the bonds of the state." It will be perceived that the complainants were not taxpayers, and had not presented to the collecting officers coupons in payment for taxes. The officials had not moved against them or their property, and had not threatened to commence aggressive acts against them as in the Baltimore & Ohio Case; and the refusal of the collectors to accept the coupons of others created no legal cause of action on the part of the complainants. The court thereupon held that:

"If the holder of Virginia coupons, receivable in payment of state taxes, sells them, agreeing with the purchaser that they shall be so received by the state, the refusal of the state to receive them constitutes no injury to him for which he could sue the state, even if it were suable, and cannot be made the foundation for preventive relief in equity against officers of the state."

And further declared that it did—

"Not intend to impinge upon the principle which justifies suits against individual defendants who, under color of the authority of unconstitutional state legislation, are guilty of personal trespasses and wrongs; nor to forbid suits against officers in their official capacity, either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest."

The result which is reached by this, perhaps wearisome, statement of the facts in the decided cases, is that the supreme court has been scrupulous not to permit suits against state officers to compel or coerce states to perform their obligations or abide by their contracts, when the officer has neither committed, nor threatened to commit, an injury to the property of the complainant, and has been willing to permit suits against officers who, under the authority of unconstitutional statutes, have attacked, or threatened to attack and injure, the vested pecuniary rights of the complainant in his property. Thus, when the state of Oregon, which had the legal title of a tract of land in which the complainant had a vested equitable title or interest, had passed a statute instructing its officers to disregard such equitable title and sell the land to other parties, the officers could be prevented by injunction from making such sale,

to the injury, if not destruction, of the complainant's equity; and the officers of the state of Louisiana could be prevented, by like writ of injunction, from a disposition of the bonds of the state in their possession and control, which would materially injure the pecuniary value of the bonds which the complainant had acquired.

The question remains whether, under the averments of the bill, the complainant has shown a similar injury and a right to a similar remedy. I shall confine myself to its interest in the fund derived from avails of the land scrip under the act of 1863. The United States gave to the state of Connecticut, in 1862, land scrip for a specified number of acres of land, which scrip was to be sold: The avails thereof were to be invested by the state, and the interest of the fund was to be inviolably appropriated for the endowment and support of at least one agricultural college, to be provided by the state within five years. The state accepted the grant, upon the conditions of the act of congress, and selected the complainant as its appointee, provided the college should contract with the state, in writing, to perform all the duties and obligations imposed upon it by the statute. Subsequently, the general assembly of the state, this contract having been entered into, and having been approved by the governor, declared, by resolution, that the act of 1863 and the agreement of the college constituted "a binding contract, inviolably securing to said corporation the income of the fund provided for in said act, so long as said corporation shall continue on its part to comply with the terms and conditions of said contract." The fund arising from the sale of the scrip was thereafter invested in bonds, indorsed and known as "Agricultural College Bonds," and constituting a separate fund, called the "Agricultural College Fund," and which is not a part of the general funds of the state. The income was continuously paid to the college, without further act on the part of the state, until 1893, when, by a statute of the general assembly, the treasurer of the state was directed not to pay the interest of the fund to Yale College until a new contract should be made. The statute does not proceed upon the theory or assumption that the college had ceased to comply with the terms and conditions of the contract of 1863, and there is no suggestion that the new act was not a breach of the pre-existing contract. Indeed, the act provides that should any question of damages, growing out of the provisions of the act, arise between the college and the state, such question shall be settled by arbitration.

In considering the right of the complainant to relief, three facts are to be borne in mind: First. The position of the college is not that of a creditor of the state; nor does its right grow out simply from a breach of contract. If the legislature should improperly refuse to permit a contractor for the erection of a public building to continue his work, no action would lie against the treasurer. If the complainant has a capacity of suing, it arises from its right to protect itself against the attack of an individual upon a piece of its property. Second. The fund is a separate one, and so carefully distinguished from the other property of the state that its securities are always capable of identification. Neither it nor its income is

a part of the general funds of the state, and the court is not called upon, as in Louisiana v. Jumel, to interfere with the management of the state treasury. If the legislature had by statute directed the treasurer to pay to Yale College, from the general funds of the state, a sum equal to 5 per cent. upon $135,000, which was due to the college by contract, and had thereafter repealed the statute, no action would lie against the treasurer to compel him to disregard the repealing act; for, having committed no trespass upon the individual property of the college, he is not a tort feasor. Third. The state has the legal title to this fund, which it holds to the use of the complainant. This trusteeship did not arise from the state's promise that it would be a trustee. Such an agreement could be broken by the state, which could divert the income, and the cestui que trust would be remediless. Trustees v. Rider, 13 Conn. 87. When the state accepted the grant upon the terms contained in the act of congress, selected the college as the sole appointee, provided it would equip itself to do the required work, and the equipment was made, "at large expense," the state became a trustee by operation of law. It did not merely agree to hold, but it held, the fund for the use of the college, and the college held the equitable title. The relations of the state to this fund were the same as they would be to a fund bequeathed by the last will of a testator, to the state, to hold, as trustee, for the perpetual benefit of the person who should be the presiding judge of the highest court of the state, and the state had accepted the trust. The entire beneficial interest of the fund is in the complainant, and the income is its property, which it is the ministerial duty of the treasurer to transfer to its owner.

The hinge of the case is whether, under this state of facts, when the treasurer threatens to move the income away from the college, he becomes a tort feasor upon its property; for, if he is a tort feasor, it is immaterial whether he commits the trespass self-moved, or in obedience to a void statute; in other words, whether the interest of the college in the specific fund, and its title to the income, is such a piece of property that it is capable of being aggressively moved upon and injured, or is the refusal to hold it to the use of the college simply a refusal to comply with an obligation of the state? From the McComb and the McConnaughy Cases it appears that it is not important whether the property is or is not in the possession of the state, nor whether the title of the complainant is absolute or equitable, and that the fact of the state's legal title thereto is also immaterial. The title which the college has to the fund is a vested beneficial right in a separate parcel of securities, capable of as exact description as the boundaries of a tract of land; and, "where one holds property for another, the vested right which the law regards is not that of the trustee, but of the beneficiary." Cooley, Const. Law, 322. The duty of the state is not merely a duty to pay a sum of money, but its duty, and that of its officers, is not to divert the beneficial right in a piece of property from the rightful beneficiary. That the right of the complainant in the fund does not

permit it to handle the property is not important, for, although it cannot handle the securities, and its interest in the corpus of the fund is also intangible, the right is one which is well defined and clearly known by the law. The tangible fruit of this equity is income, and, where the income is diverted by the treasurer from the rightful owner, he individually commits that which the law styles a "wrong." It may be said that in the McComb Case the defendants were trustees, whereas the state, and not the treasurer, is the trustee of the fund, and that an improper use of it which is directed by the state is its tortious act, and not that of the treasurer. This begs the question. The state is, in this class of cases, always the original wrongdoer; but, as the officer cannot protect himself by a void law of the state from the consequences of his own acts, he is considered a wrongdoer also.

My conclusion is that the college is entitled to its preventive remedy by an injunction to restrain the defendant from paying the income of the land-scrip fund to any other person than itself; but it does not necessarily follow that, under this bill in equity, the complainant is entitled to affirmative relief, because affirmative relief, viz. a decree that he should pay the income to the complainant, may be considered an attempt to compel the state to execute its contracts, and the power of the court may be regarded as exhausted when it prevents an officer from invading the property rights of the complainant. Hans v. Louisiana, 134 U. S. 1, 10 Sup. Ct. 504; Pennoyer v. McConnaughy, supra. As the demurrer goes to the entire bill, it is not absolutely necessary, at this time, to consider the alleged rights of the complainant to the annual appropriations which are being made by the United States under the act of 1890, and which will amount in time to $25,000 annually; but I am not willing, by silence, to have it inferred that I absolutely concur in the position of the complainant's counsel that since the establishment of the complainant's college by its endowment, under the federal statute of 1862, the state of Connecticut has no power to establish another college under the provisions of that act, or to make any other disposition of the appropriations under the federal statute of 1890 than those which it had specified in the state statute of 1863. The complainant's counsel think that, having selected an appointee, the state had, under the United States act of 1890, no new power to select another appointee, or to endow it; and that the power of appropriation was exhausted; and that, as to colleges which had been established under the act of 1862, the appropriations under the act of 1890 are directly for their benefit, and not for the benefit of new institutions. The provisions of the act are vaguely expressed, and a construction of the statute is postponed until a decision is necessary. I also doubt whether the selection of the complainant by the act of 1863 was more than a selection to be the cestui que trust of the fund arising from the sale of the particular land scrip which had been then donated, and properly included an absolute and exclusive right to receive moneys which should thereafter be appropriated by congress,—a right in-

capable of interruption, although the state had, by its silence of two or three years, assented to the payment to the complainant of such appropriations. The demurrer is overruled.