NEW HAMPSHIRE *v.* LOUISIANA and Others.

NEW YORK *v.* LOUISIANA and Others.

ORIGINAL.

Decided March 5th, 1883.

*Constitutional Law—International Law—Jurisdiction—Sovereign State.*

1. The history of article XI. of the amendment to the Constitution which provides that the judicial power of the federal courts shall not extend to suits against a State by a citizen of another State, or by citizens or subjects of a foreign State, and the causes which led to its adoption, reviewed.
2. Unless the State prosecuted consents, that amendment prohibits the court from entertaining jurisdiction of a cause in which one State seeks relief against another State on behalf of its citizens, in a matter in which the State prosecuting has no interest of its own. One State cannot create a controversy with another State, within the meaning of that term as used in the judicial clauses of the Constitution, by assuming the prosecution of debts owing by the other State to its citizens.
3. The relation of one of the United States to its citizens is not that of an independent sovereign State to its citizens. A sovereign State seeking redress of another sovereign State on behalf of its citizens can resort to war on refusal, which a State cannot do.
4. The qualifications of the duty of a sovereign State to assume the collection of the debts of its citizens from another sovereign State considered and stated.

The case on which the opinion is given is thus stated by the court.

On the 18th of July, 1879, the general court of New Hampshire passed an act, of which the following is a copy:

" AN ACT to protect the rights of citizens of this state, holding claims against other States.
" *Be it enacted by the Senate and House of Representatives in General Court convened.*

SECTION 1. Whenever any citizen of the State shall be the owner of any claim against any of the United States of America, arising upon a written obligation to pay money issued by such State, which obligation shall be past due and unpaid, such citizen holding such claim may assign the same to the State of New Hampshire, and deposit the assignment thereof, duly exe-

cuted and acknowledged in the form and manner provided for the execution and acknowledgment of deeds of real estate by the laws of this State, together with all the evidence necessary to substantiate such claim, with the attorney-general of the State.

"Sec. 2. Upon such deposit being made, it shall be the duty of the attorney-general to examine such claim and the evidence thereof, and if, in his opinion, there is a valid claim which shall be just and equitable to enforce, vested by such assignment in the State of New Hampshire, he, the attorney-general, shall, upon the assignor of such claim depositing with him such sum as he, the said attorney-general, shall deem necessary to cover the expenses and disbursements incident to, or which may become incident to the collection of said claim, bring such suits, actions or proceedings in the name of the State of New Hampshire, in the Supreme Court of the United States, as he, the said attorney-general, shall deem necessary for the recovery of the money due upon such claim ; and it shall be the duty of the said attorney-general to prosecute such action or actions to final judgment, and to take such other steps as may be necessary after judgment for the collection of said claim, and to carry such judgment into effect, or, with the consent of the assignor, to compromise, adjust, and settle such claim before or after judgment.

" Sec. 3. Nothing in this act shall authorize the expenditure of any money belonging to this State, but the expenses of said proceedings shall be paid by the assignor of such claim ; and the assignor of such claim may associate with the attorney-general in the prosecution thereof, in the name of the State of New Hampshire, such other counsel as the said assignor may deem necessary, but the State shall not be liable for the fees of such counsel, or any part thereof.

" Sec. 4. The attorney-general shall keep all moneys collected upon such claim, or by reason of any compromise of any such claim, separate and apart from any other moneys of this State which may be in his hands, and shall deposit the same to his own credit, as special trustee under this act, in such bank or banks as he shall select ; and the said attorney-general shall pay to the assignor of such claims all such sums of money as may be recovered by him in compromise or settlement of such claims, deducting therefrom all expenses incurred by said attorney not before that time paid by the assignor.

"SEC 5. This act shall take effect on its passage."

Under this act six of the consolidated bonds of the State of
Louisiana, particularly described in the cases of *State ex rel.
Elliott* v. *Jumel* and *Elliott* v. *Wiltz*, 107 U. S. 711, were as-
signed to the State of New Hampshire by one of its citizens.
This assignment was made for the purposes contemplated in
the act, and passed to the State no other or different title than
it would acquire in that way. After the assignment was per-
fected a bill in equity was filed in this court in the name of the
State of New Hampshire, as complainant, against the State of
Louisiana and the several officers of that State who compose the
board of liquidation provided for in the act authorizing the issue
of the bonds. The averments in the bill were substantially the
same as those in *Elliott* v. *Jumel*, save only that in this case
the ownership of the bonds specially involved was stated to be
in New Hampshire, while in that it was in Elliott and his as-
sociates. The prayer was in substance for a decree that the
bonds and the act and constitutional amendment of 1874 con-
stitute a valid contract between Louisiana and the holders of
its bonds; that the defendants and each of them might be pro-
hibited from diverting the proceeds of the taxes levied under
the act from the payment of the interest, and that the provi-
sions of the debt ordinance of 1879 might be adjudged void and
of no effect, because they impaired the obligation of the con-
tract. The bill was signed in the name of New Hampshire by
the attorney-general of that State and also by the same counsel
who appeared for Elliott, Gwynn & Walker in their suit in
equity reported in 107 U. S.

On the 15th of May, 1880, the legislature of New York
passed the following act:

"AN ACT to protect the rights of citizens of this State owning
and holding claims against other States.

"*The people of the State of New York, represented in Senate and
Assembly, do enact as follows:*

"SECTION 1. Any citizen of this State, being the owner and
holder of any valid claim against any of the United States of

America, arising upon a written obligation to pay money, made, executed, and delivered by such State, which obligation shall be past due and unpaid, may assign the same to the State of New York, and deliver the assignment thereof to the attorney-general of the State. Such assignment shall be in writing, and shall be duly acknowledged before an officer authorized to take the acknowledgment of deeds, and the certificate of such acknowledgment shall be duly indorsed upon such assignment before the delivery thereof. Every such assignment shall contain a guaranty, on the part of the assignor, to be approved by the attorney-general, of the expenses of the collection of such claim, and it shall be the duty of the attorney-general, on receiving such assignment, to require on behalf such assignor, such security for said guaranty as he shall deem adequate.

"Sec. 2. Upon the execution and delivery of such assignment, in the manner provided for in section one of this act, and furnishing the security as in said section provided, and the delivery of such claim to him, the attorney-general shall bring and prosecute such action or proceeding, in the name of the State of New York, as shall be necessary for the recovery of the money due on such claim, and the said attorney-general shall prosecute such action or proceeding to final judgment, and shall take such proceedings after judgment as may be necessary to effectuate the same.

"Sec. 3. The attorney-general shall forthwith deliver to the treasurer of the State, for the use of such assignor, all moneys collected upon such claim, first deducting therefrom all expenses incurred by him in the collection thereof, and said assignor, or his legal representatives, shall be paid said money by said treasurer upon producing the check or draft therefor of the attorney-general to his or their order and proof of his or their identity.

"Sec. 4. This act shall take effect immediately."

On the 20th of April, 1881, E. K. Goodnow and Benj. Graham, being the holders and owners of thirty coupons cut from ten of the consolidated bonds of Louisiana falling due January 1st, 1880, July 1st, 1880, and January 1st, 1881, assigned them to the State of New York by an instrument in writing, of which the following is a copy :

"Know all men by these presents, that we, the undersigned, citizens of the State of New York, being the owners and holders of valid claims against the State of Louisiana, arising upon written obligations to pay money, made, executed, and delivered by the State of Louisiana, and now past due and unpaid, being the coupons hereto annexed, in consideration of one dollar to each of us paid by the State of New York, and for other good and valuable considerations, hereby assign and transfer the said claims and coupons to the State of New York.

"And we do hereby covenant with the said State that if an attempt is made by it to collect the said claim from the State of Louisiana we will pay all the expenses of the collection of the same.

"In witness whereof we have hereunto set our hands and affixed our seals this twentieth day of April, in the year of our Lord one thousand eight hundred and eighty-one.

                                 "E. K. GOODNOW.    [L. S.]
                                 "BENJ. GRAHAM.     [L. S.]
     "Sealed and delivered in presence of—
          "FRANK M. CARSON."

Thereupon the State of New York, on the 25th of April, filed in this court a bill in equity against the State of Louisiana and the officers of the State composing the board of liquidation, with substantially the same averments and the same prayer as in that of the State of New Hampshire. There was, however, a statement in this bill not in the other, to the effect that many of the consolidated bonds were issued to citizens of the State of New York in exchange for old bonds of Louisiana which they held, and that citizens of New York now hold and own bonds of the same class to a large amount. Testimony has been taken in support of this averment.

*Mr. Wheeler H. Peckham* for the State of New Hampshire. —I. The controversy is one arising on a contract. This species of controversy is within the jurisdiction of the court.— II. The particular contracts are negotiable instruments of which the State by assignment is legal owner, and in the suit is the real party in interest, whether the transfer was an

actual sale or merely colorable. *Sheridan* v. *The Mayor*, 68 N. Y. 30; *Mercer County* v. *Hackett*, 1 Wall. 83 ; *Nat. Bank* v. *Texas*, 20 Wall. 72; Edwards on Bills, 130–132 ; *Hays* v. *Hathorn*, 74 N. Y. 468.—III. The remedy is not sought against the State, but against other defendants to restrain them from diversion of funds.   If the State cannot be made a party, a court of equity will proceed without it.   *Board of Liquidators* v. *McComb*, 92 U. S. 531.   New Hampshire seeks only the relief which would be granted in a suit between indi-viduals in a circuit court.   Louisiana had power to issue these bonds ; New Hampshire power to acquire them.   *United States* v. *Bank*, 15 Pet. 377; *Union Branch Railroad Company* v. *East Tennessee, &c., Railroad Company*, 14 Geo. 327.   The creditor State is entitled here to the same remedies against the debtor State, which one individual would have against another in a cir-cuit court.—IV. The fact that the ownership is acquired under a statute does not oust the jurisdiction.   No citizen of one coun-try can sue in the courts of his own country any other State or sovereignty, nor can he sue such other State in its own courts. He must resort to his sovereign (*i. e.* New Hampshire), for re-dress ; and under the federative system this court, in a con-troversy between States, takes the place of the last resort of independent nations.   *Rhode Island* v. *Massachusetts*, 12 Peters, 657.—V. This jurisdiction extends even to political questions between States, when a judicial question arises for their settlement.   *Rhode Island* v. *Massachusetts, ubi sup.*; *Virginia* v. *West Virginia*, 11 Wall. 39.   *Mr. Peckham* also dis-cussed some provisions of the Constitution of Louisiana, and the peremptory remedies sought for.

*Mr. Leslie W. Russell*, Attorney-General of New York, *Mr. David Dudley Field*, and *Mr. William A. Duer*, for the State of New York.—The parties to the controversy, the States of New York and Louisiana ; and the officers of the latter charged with the assessment and collection of taxes and pay-ment of the debt; the subject of the controversy—a contract by the State of Louisiana for the payment of money ; and the remedies sought for the enforcement of that contract are all

within the jurisdiction of the court when properly brought before it.—I. A State of this Union can implead another State in this court for a money demand. *Van Stophorst* v. *Maryland*, 2 Dallas, 401; *Oswald* v. *New York*, 2 Dallas, 401, 402 and 415; *Chisholm* v. *Georgia*, 2 Dallas, 419; *Grayson* v. *Virginia*, 3 Dallas, 320; *Hollingsworth* v. *Virginia*, 3 Dallas, 378; *Huger* v. *South Carolina*, 3 Dallas, 339; *Cutting* v. *South Carolina*, 2 Dallas, 415, note; *New York* v. *Connecticut*, 4 Dallas, 1.—II. The assignment of the demand for the purpose of suing does not affect this right. The right and duty of every sovereign State, on behalf of its citizens, to call upon any other sovereign State for the fulfilment of its obligations to those citizens, is an established rule of international law. Our own country has acted upon it so often, that with us it is no longer an open question. Our diplomatic correspondence is full of references to it. The argument cites also Stat. 4 Hen. IV. ch. 7; Ordonance de la Marine, 1681; Grotius, B. 3 ch. 2, sec. 5 subdivision 2; Vattel, book 2, ch. 18, page 347, with Ingersoll's notes, 1869; Rives' Life of Madison, vol. 1, 564; vol. 2, 41; Manning's Law of Nations, 150 (Amos edition); 2 Twiss' Law of Nations, sec. 11; 2 Phil. Int. Law, 8; The Federalist. The extent of the jurisdiction over controversies between the States, and the manner of exercising it, have been so often considered by the court, that a reference to the cases is hardly necessary. Thus the suit of New Jersey against New York, begun in 1830, appears three times in the reports, and that of Rhode Island against Massachusetts, begun in 1832, appears five times. *New Jersey* v. *New York*, 3 Pet. 461; 5 Pet. 284, where Chief Justice Marshall goes over the subject, and 6 Pet. 323; *Rhode Island* v. *Massachusetts*, 12 Pet. 657, where the jurisdiction was considered at length by Mr. Justice Baldwin; 13 Pet. 23, 14 Pet. 210, 15 Pet. 233, and 4 How. 591. In *Poole* v. *Fleeger*, 11 Pet. 185, 209, Mr. Justice Story, delivering the opinion of the court, used this language respecting the rights of the States, under the law of nations, independent of the Constitution. . . . "It cannot be doubted, that it is a part of the general right of sovereignty, belonging to independent nations, to establish and fix the disputed boundaries between their re-

spective territories ; and the boundaries so established and fixed by compact between nations, become conclusive upon all the subjects and citizens thereof, and bind their rights, and are to be treated, to all intents and purposes, as the true and real boundaries. This is a doctrine universally recognized in the law and practice of nations. It is a right equally belonging to the States of this Union, unless it has been surrendered under the Constitution of the United States. So far from there being any pretence of such a general surrender of the right, that it is expressly recognized by the Constitution, and guarded in its exercise by a single limitation or restriction requiring the consent of Congress. The Constitution declares, that ' No State shall, without the consent of Congress, enter into any agreement or compact with another State ; ' thus plainly admitting that, with such consent it might be done ; and in the present instance that consent has been expressly given. The compact, then, has full validity, and all the terms and conditions of it must be equally obligatory upon the citizens of both States."— III. Even if a suit cannot be maintained against the State, its officers can be required to apply the money in their hands to the payment of interest. *Kendall's Case,* 12 Pet. 527 ; the *King* v. *Lord Commissioners,* 5 Nev. and Man. 589 ; 6 Nev. and Man. 508.—IV. They may, also, in case the amount in their hands is insufficient for that purpose, be required to assess and collect a tax. *Board Comrs. Knox County* v. *Aspinwall and others,* 24 How. 376 ; *Supervisors* v. *United States,* 4 Wallace, 435 ; *Von Hoffmann* v. *City of Quincy,* 4 Wall. 535 ; *City of Galena* v. *Amy,* 5 Wall. 705 ; *Walkley* v. *City of Muscatine,* 6 Wall. 481 ; *Mayor* v. *Lord,* 9 Wall. 409 ; *United States* v. *Boutwell,* 17 Wall. 604 ; *Heine* v. *Levee Commissioners,* 19 Wall. 655 ; *Loan Association* v. *Topeka,* 20 Wall. 655 ; *Board of Liquidation* v. *McComb,* 92 U. S. 531 ; *United States* v. *Memphis,* 97 U. S. 284 ; *Memphis* v. *United States,* 97 U. S. 293 ; *Memphis* v. *Brown,* 97 U. S. 300 ; *United States* v. *Fort Scott,* 99 U. S. 152 ; *County of Greene* v. *Daniel,* 102 U. S. 187 ; *Louisiana* v. *New Orleans,* 102 U. S. 203 ; *Louisiana* v. *United States,* 103 U. S. 289 ; *Wolff* v. *New Orleans,* 103 U. S. 358.

*Mr. J. C. Egan*, Attorney-General of Louisiana, and *Mr. John A. Campbell* for the State of Louisiana.—I. The judicial power of the United States does not extend to suits against a State.—II. An agreement by a State with an individual creates no juridical obligation and no juridical relation between the parties. Federalist, No. 81; 6 Webster's Works, 537; 1 Calhoun's Works, 260. The clause in the Constitution forbidding a State to impair the obligation of a contract has no application to such agreements. The term "contract" is narrower than the term "agreement." A contract is an agreement which raises an obligation that can be enforced at law. Anson on Contracts, sec. 9; Pollock on Contracts, 6; Austin on Jurisprudence, 1016, 17. This distinction was known to the framers of the Constitution, and they used language applicable to perfect obligations, which could be enforced at law, and which had no application to those imperfect obligations which men owe to themselves or their families, or their neighbors, but which cannot be enforced at law. This distinction is recognized in the English courts, *Crouch v. Credit Foncier*, L. R. 8 Q. B. at page 384; and by French jurists, 42 Dalloz, Jurisp. Gen. Tresor public, No. 1105; and by this court, *Bank of United States v. United States*, 5 How. 382. He also cited 15 Laurent, No. 424, p. 477; 1 Picot, Code Civ. p. 162-3; Larombière des Obligations, 360-364; ib. 58-59; 1 Bentham's Works, 148; *Sturges v. Crowninshield*, 4 Wheat. 122, 208; *Dartmouth College v. Woodward*, 4 Wheat. 518; *Ogden v. Saunders*, 12 Wheat. 213, 332.—III. The United States enjoy immunity from suits as matter of right. *United States v. Clarke*, 8 Pet. 436; *Briscoe v. Bank*, 11 Pet. 257; *United States v. McLemore*, 4 How. 286; *The Siren*, 7 Wall. 152; *The Davis*, 10 Wall. 15; *Carr v. United States*, 98 U. S. 433; *United States v. Thompson*, ib. 486. An obligation to pay the debts contracted before the Constitution was inserted in article VI. It was part of the supreme law. But the creditors had no *vinculum juris*. Theirs were *pacta quæ non habent causam civilem*. This is a case strictly analogous to the case stated in the bill.—IV. This is not a controversy between States. It is a vicarious controversy between individuals. Controversies between States have little resem-

blance to those between individuals. They arise out of public relations and intercourse, and involve political rights.—V. Courts of chancery discourage suits that are artificially produced, and do not arise on the relations of the parties. The merchandise consisting merely of a faculty to come into court, is not allowed.—VI. The rule of chancery is that the immediate parties to a contract, or their successors, are necessary parties to a suit for its enforcement. In this case the State is the only party indebted, or charged to be indebted. The object of the bill is to establish a debt against her, to be paid out of money belonging to her. *Shields* v. *Barrow,* 17 How. 130 ; *Coiron* v. *Millauden,* 19 How. 113; Pomeroy on Contracts, 546, 484–5, 491.—VII. In the New York case an argument of a wider scope is presented ; that the State of New York, having been a sovereign, and with powers to make war, issue letters of marque and reprisal, and otherwise to act in a belligerent way, resigned these powers into the control of the United States, to be held in trust, and therefore this court must make decrees in the cases in favor of the plaintiff, for judgment, making declaration of the default of Louisiana, and to subject her collecting agencies and accounting officers to the demands of the bill, and to compel the collection of taxes, to pay all the holders of coupons and bonds within the State of New York their interest and principal, from year to year, till the debt becomes due in A. D. 1914. No precedent of such a suit has been cited, and it must be admitted the present has the merit of originality and invention. It is opposed to the general practice of nations, and the testimony of the leading bankers of Great Britain and of the leading financiers of Europe is a dissent and contradiction to any policy or right to use governmental power in such cases. Mr. Campbell reviewed the acts of government in such cases, and closed with an argument upon the constitutions of Louisiana.

*Mr. Peckham* and *Mr. Field* replied.

Mr. CHIEF JUSTICE WAITE delivered the opinion of the court. After stating the case he continued :

The first question we have to settle is whether, upon the facts shown, these suits can be maintained in this court.

Art. III., sec. 2, of the Constitution provides that the judicial power of the United States shall extend to "controversies between two or more States," and "between a State and citizens of another State." By the same article and section it is also provided that in cases "in which a State shall be a party, the Supreme Court shall have original jurisdiction." By the Judiciary Act of 1789, c. 20, sec. 13, 1 Stat. 80, the Supreme Court was given "exclusive jurisdiction of all controversies of a civil nature, where a State is a party, except between a State and its citizens; and except also between a State and citizens of other States, or aliens, in which latter case it shall have original but not exclusive jurisdiction."

Such being the condition of the law, Alexander Chisholm, as executor of Robert Farquar, commenced an action of assumpsit in this court against the State of Georgia, and process was served on the governor and attorney-general. *Chisholm* v. *Georgia*, 2 Dall. 419. On the 11th of August, 1792, after the process was thus served on Mr. Randolph, the attorney-general of the United States, as counsel for the plaintiff, moved for a judgment by default on the fourth day of the next term, unless the State should then, after notice, show cause to the contrary. At the next term Mr. Ingersoll and Mr. Dallas presented a written remonstrance and protestation on behalf of the State against the exercise of jurisdiction, but in consequence of positive instructions they declined to argue the question. Mr. Randolph, thereupon, proceeded alone, and in opening his argument said, "I did not want the remonstrance of Georgia, to satisfy me that the motion which I have made is unpopular. Before the remonstrance was read, I had learnt from the acts of another State, whose will must always be dear to me, that she too condemned it."

On the 19th of February, 1793, the judgment of the court was announced, and the jurisdiction sustained, four of the justices being in favor of granting the motion and one against it. All the justices who heard the case filed opinions, some of which were very elaborate, and it is evident the subject re-

ceived the most careful consideration.   Mr. Justice Wilson in his opinion uses this language, p. 465 :

"Another declared object (of the Constitution) is, ' to establish justice.'   This points, in a particular manner, to the judicial authority.   And when we view this object in conjunction with the declaration, ' that no State shall pass a law impairing the obligation of contracts,' we shall probably think, that this object points, in a particular manner, to the jurisdiction of the court over the several States.   What good purpose could this constitutional provision *secure*, if a State might pass a law impairing the obligation of *its own* contracts; and be amenable for such a violation of right, to no controlling judiciary power ? "

And Chief Justice Jay, p. 479 :

" The extension of the judiciary power of the United States to such controversies, appears to me to be *wise*, because it is *honest*, and because it is *useful*.   It is *honest*, because it provides for doing justice without respect to persons, and by securing individual citizens, as well as States, in their respective rights, performs the promise which every government makes to every free citizen, of equal justice and protection.   It is *useful*, because it is honest, because it leaves not even the most obscure and friendless citizen without means of obtaining justice from a neighboring State ; because it obviates occasions of quarrels between States on account of the claims of their respective citizens ; because it recognizes and strongly rests on this great moral truth, that justice is the same whether due from one man or a million, or from a million to one man; because it teaches and greatly appreciates the value of our free republican national government, which places all our citizens on an equal footing, and enables each and every of them to obtain justice without any danger of being overborne with the might and number of their opponents ; and because it brings into action, and enforces the great and glorious principle, that the people are the sovereign of this country, and consequently that fellow citizens and joint sovereigns cannot be degraded by appearing with each other in their own courts to have their controversies determined."

Prior to this decision the public discussions had been confined

to the power of the court, under the Constitution, to entertain a suit in favor of a citizen against a State; many of the leading members of the convention arguing, with great force, against it. As soon as the decision was announced, steps were taken to obtain an amendment of the Constitution withdrawing jurisdiction. About the time the judgment was rendered, another suit was begun against Massachusetts, and process served on John Hancock, the governor. This led to the convening of the general court of that commonwealth, which passed resolutions instructing the senators and requesting the members of the House of Representatives from the State " to adopt the most speedy and effectual measures in their power to obtain such amendments in the Constitution of the United States as will remove any clause or articles of the said Constitution, which can be construed to imply or justify a decision that a State is compellable to answer in any suit by an individual or individuals in any courts of the United States." Other States also took active measures in the same direction, and, soon after the next Congress came together, the eleventh amendment to the Constitution was proposed, and afterwards ratified by the requisite number of States, so as to go into effect on the 8th of January, 1798. That amendment is as follows:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens and subjects of any foreign State."

Under the operation of this amendment the actual owners of the bonds and coupons held by New Hampshire and New York are precluded from prosecuting these suits in their own names. The real question, therefore, is whether they can sue in the name of their respective States, after getting the consent of the State, or, to put it in another way, whether a State can allow the use of its name in such a suit for the benefit of one of its citizens.

The language of the amendment is, in effect, that the judicial power of the United States shall not extend to any suit commenced or prosecuted *by* citizens of one State against another

State. No one can look at the pleadings and testimony in these cases without being satisfied, beyond all doubt, that they were in legal effect commenced, and are now prosecuted, solely by the owners of the bonds and coupons. In New Hampshire, before the attorney-general is authorized to begin a suit, the owner of the bond must deposit with him a sum of money sufficient to pay all costs and expenses. No compromise can be effected except with the consent of the owner of the claim. No money of the State can be expended in the proceeding, but all expenses must be borne by the owner, who may associate with the attorney-general such counsel as he chooses, the State being in no way responsible for fees. All moneys collected are to be kept by the attorney-general, as special trustee, separate and apart from the other moneys of the State, and paid over by him to the owner of the claim, after deducting all expenses incurred not before that time paid by the owner. The bill, although signed by the attorney-general, is also signed, and was evidently drawn, by the same counsel who prosecuted the suits for the bondholders in Louisiana, and it is manifested in many ways that both the State and the attorney-general are only nominal actors in the proceeding. The bond owner, whoever he may be, was the promoter and is the manager of the suit. He pays the expenses, is the only one authorized to conclude a compromise, and if any money is ever collected, it must be paid to him without even passing through the form of getting into the treasury of the State.

In New York no special provision is made for compromise or the employment of additional counsel, but the bondholder is required to secure and pay all expenses and gets all the money that is recovered. This State, as well as New Hampshire, is nothing more nor less than a mere collecting agent of the owners of the bonds and coupons, and while the suits are in the names of the States, they are under the actual control of individual citizens, and are prosecuted and carried on altogether by and for them.

It is contended, however, that, notwithstanding the prohibition of the amendment, the States may prosecute the suits, because, as the "sovereign and trustee of its citizens," a State is

"clothed with the right and faculty of making an imperative demand upon another independent State for the payment of debts which it owes to citizens of the former." There is no doubt but one nation may, if it sees fit, demand of another nation the payment of a debt owing by the latter to a citizen of the former. Such power is well recognized as an incident of national sovereignty, but it involves also the national powers of levying war and making treaties. As was said in the *United States* v. *Diekelman,* 92 U. S. 520, if a sovereign assumes the responsibility of presenting the claim of one of his subjects against another sovereign, the prosecution will be "as one nation proceeds against another, not by suit in the courts, as of right, but by diplomatic negotiation, or, if need be, by war."

All the rights of the States as independent nations were surrendered to the United States. The States are not nations, either as between themselves or towards foreign nations. They are sovereign within their spheres, but their sovereignty stops short of nationality. Their political status at home and abroad is that of States in the United States. They can neither make war nor peace without the consent of the national government. Neither can they, except with like consent, "enter into any agreement or compact with another State." Art. 1, sec. 10, cl. 3.

But it is said that, even if a State, as sovereign trustee for its citizens, did surrender to the national government its power of prosecuting the claims of its citizens against another State by force, it got in lieu the constitutional right of suit in the national courts. There is no principle of international law which makes it the duty of one nation to assume the collection of the claims of its citizens against another nation, if the citizens themselves have ample means of redress without the intervention of their government. Indeed, Sir Robert Phillimore says, in his Commentaries on International law, vol. II., 2d ed., page 12:

"As a general rule, the proposition of Martens seems to be correct, that the foreigner can only claim to be put on the same footing as the native creditor of the State."

Whether this be in all respects true or not, it is clear that no nation ought to interfere, except under very extraordinary cir-

cumstances, if the citizens can themselves employ the identical and only remedy open to the government if it takes on itself the burden of the prosecution. Under the Constitution, as it was originally construed, a citizen of one State could sue another State in the courts of the United States for himself, and obtain the same relief his State could get for him if it should sue. Certainly, when he can sue for himself, there is no necessity for power in his State to sue in his behalf, and we cannot believe it was the intention of the framers of the Constitution to allow both remedies in such a case. Therefore, the special remedy, granted to the citizen himself, must be deemed to have been the only remedy the citizen of one State could have under the Constitution against another State for the redress of his grievances, except such as the delinquent State saw fit itself to grant. In other words, the giving of the direct remedy to the citizen himself was equivalent to taking away any indirect remedy he might otherwise have claimed, through the intervention of his State, upon any principle of the law of nations. It follows that when the amendment took away the special remedy there was no other left. Nothing was added to the Constitution by what was thus done. No power taken away by the grant of the special remedy was restored by the amendment. The effect of the amendment was simply to revoke the new right that had been given, and leave the limitations to stand as they were. In the argument of the opinions filed by the several justices in the Chisholm case, there is not even an intimation that if the citizen could not sue, his State could sue for him. The evident purpose of the amendment, so promptly proposed and finally adopted, was to prohibit all suits against a State by or for citizens of other States, or aliens, without the consent of the State to be sued, and, in our opinion, one State cannot create a controversy with another State, within the meaning of that term as used in the judicial clauses of the Constitution, by assuming the prosecution of debts owing by the other State to its citizens. Such being the case we are satisfied that we are prohibited, both by the letter and the spirit of the Constitution, from entertaining these suits, and

*The bill in each case is dismissed.*