Manuel Terceiro Esmoris, demandante y apelante, *v.* División de Hogares Seguros, Etc., demandada y apelada.

Núm. 7500.—*Sometido:* Febrero 23, 1938. *Resuelto:* Julio 23, 1938.

*Oscar Souffront,* abogado del apelante; *Hon. B. Fernández García* y *Harry B. Llenza,* Oficial Jurídico, División de Hogares Seguros, abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

La demanda interpuesta en este caso tiene por objeto obligar a los funcionarios públicos demandados al cumplimiento específico de un contrato y al pago de daños y perjuicios.

Alega el demandante, como primera causa de acción, que es dueño de una finca de 300 cuerdas; que en 16 de junio de 1932 la anterior Comisión de Hogares Seguros le hizo una oferta para la compra de dicha finca por la suma de $13,500, la que fué aceptada por el demandante con fecha 9 de julio del mismo año, quedando así perfeccionado un contrato de compraventa; que antes de aceptar el demandante la oferta que le hiciera la Comisión de Hogares Seguros, se convino entre las partes que el precio se computaría a base de $45 por cuerda; que el demandante fué requerido por el abogado de la Comisión para que remitiese como remitió a la Comisión los títulos y documentos necesarios para proceder al otorgamiento del contrato; que en cumplimiento de lo estipulado el demandante se abstuvo de hacer trabajos de conservación y cultivo en la finca, motivo por el cual las cosechas de café en los años 1932, 1933 y 1934 fueron menos del cincuenta por ciento de las que producía la finca normalmente; y que el demandante ha estado siempre dispuesto a cumplir el contrato, mas no así la demandada, la cual se ha negado a cumplirlo.

En la segunda causa de acción alega que como consecuencia del incumplimiento por parte de la demandada el demandante ha sufrido daños por la suma de $8,000.

En la súplica de la demanda se pide sentencia condenando a los funcionarios demandados a cumplir específicamente el alegado contrato de compraventa y a pagar al demandante $13,500 como precio de la finca, con intereses desde la interposición de la demanda, más la suma de $8,000 como indemnización, más las costas, todo con cargo a los fondos de la Comisión de Hogares Seguros. No se solicita remedio alguno contra ninguno de los demandados en su carácter privado.

Contestaron los demandados y alegaron que las negociaciones para la compraventa de la finca del demandante se hicieron con sujeción a la autoridad concedida al Tesorero de Puerto Rico para emitir bonos hasta la suma de $500,000,

para dedicar el producto a la compra de terrenos para ser destinados a granjas agrícolas, "y con la condición precisa y expresa de que dichos bonos fueran emitidos y su producto puesto a disposición de la Comisión de Hogares Seguros para tales fines"; que las negociaciones entre el demandante y la Comisión quedaron suspendidas por orden administrativa del Gobernador de Puerto Rico de fecha 8 de julio de 1932; que la Comisión en ningún momento prohibió al demandante que realizara trabajos en la finca para su conservación y cultivo, y que si el demandante se abstuvo de hacer dichos trabajos lo hizo por su cuenta y bajo su responsabilidad, pues él tuvo conocimiento desde julio de 1932 de la orden administrativa del 8 de dicho mes, la que puso fin a las negociaciones para la compraventa de la finca y a virtud de la cual el Tesorero de Puerto Rico suspendió la emisión de bonos que había de producir los fondos necesarios para la compra de terrenos para granjas agrícolas; que como consecuencia de la actitud del Tesorero de Puerto Rico, la Comisión de Hogares Seguros y los aquí demandados carecen de fondos con que poder atender las obligaciones de la compra de la finca del demandante; y niegan que el demandante haya sufrido daño alguno. Y como defensas especiales y separadas alegaron:

A. Los hechos alegados en la demanda son insuficientes para determinar una causa de acción.

B. Defecto de partes demandadas por no haberse hecho parte a El Pueblo de Puerto Rico; que éste es la parte realmente interesada en el caso y no ha prestado su consentimiento para ser demandado.

C. Imposibilidad de cumplir específicamente el contrato, si alguno se hubiere celebrado, por carecer la División de Hogares Seguros de los fondos necesarios para la compra de la finca del demandante.

D. Que la acción está prescrita a tenor de las disposiciones del Artículo 9 de la Ley núm. 76 de 13 de abril de 1916, enmendada por la núm. 11 de 18 de abril de 1928, por haberse ejercitado

la acción más de dos años después del 9 de julio de 1932, fecha en que según alega el demandante quedó perfeccionado el alegado contrato.

E. Que el demandante está impedido de reclamar los daños y perjuicios que alega haber sufrido, a virtud de las disposiciones del párrafo B del artículo 1 de la Ley núm. 76 de abril 13, 1916, enmendado por la núm. 11 de 18 de abril de 1928, que dispone que no se recobrarán daños y perjuicios que se hubieren ocasionado por El Pueblo de Puerto Rico, con anterioridad a la fecha en que se entable la acción.

La Corte de Distrito de San Juan dictó sentencia desestimando la demanda e imponiendo las costas al demandante, quien no estando conforme apeló.

■ ■ Los seis señalamientos que aparecen en el alegato del apelante se refieren prácticamente a la única cuestión sustancial envuelta en el caso, la que puede resumirse así:

¿Erró la corte inferior al resolver que carecía de jurisdicción, por tratarse de una acción dirigida contra El Pueblo de Puerto Rico y no haber dado éste su consentimiento para ser demandado?

Antes de considerar y resolver la cuestión así planteada, debemos considerar como una cuestión previa si El Pueblo de Puerto Rico era parte necesaria y esencial para el ejercicio de la acción interpuesta en el presente caso. El apelante dirigió su acción contra la División de Hogares Seguros en el Departamento del Trabajo de Puerto Rico, representada por los Comisionados del Trabajo, de Sanidad y del Interior; y sostiene que El Pueblo de Puerto Rico no es parte necesaria en la acción. El Pueblo de Puerto Rico no ha sido emplazado, ni ha comparecido voluntariamente en el pleito y no ha estado en ningún momento bajo la jurisdicción de la corte sentenciadora. La inclusión de los Comisionados que constituyen la División de Hogares Seguros, como partes demandadas, no convierte al Pueblo de Puerto Rico en parte demandada. Éste debe ser mencionado en la demanda y emplazado en la forma prescrita por el Artículo

93 del Código de Enjuiciamiento Civil (ed. 1933), para que la corte pueda adquirir jurisdicción sobre el mismo. Así lo ha sostenido el Tribunal Supremo Federal en *Davis* v. *Gray,* 16 Wall 203 (21 L. Ed. 477), diciendo:

"Cuando el Estado está interesado, se le debe hacer parte, si se puede. El que no pueda hacerse es una razón suficiente para que se le omita, y la Corte puede proceder a dictar sentencia contra los funcionarios del Estado en todos respectos como si el Estado fuese parte en el récord. Para decidir quiénes son partes en el pleito, las cortes no mirarán más allá del récord. *El hacer parte a un funcionario del Estado no hace parte al Estado, aun cuando sus leyes hayan motivado el acto del funcionario y el Estado le respalde como una parte realmente interesada.* El Estado puede ser hecho parte solamente redactando la demanda expresamente con ese fin, como cuando se trata de poner a individuos o corporaciones en esa relación con el caso." (Itálicas nuestras.)

 Para sostener su contención de que las acciones sobre cumplimiento específico de contrato y daños y perjuicios por su incumplimiento pueden ser ejercitadas contra los funcionarios que representaron al Estado en la celebración del contrato, sin tomar en consideración el interés que pueda tener el Estado, el apelante ha citado numerosas decisiones del Tribunal Supremo Federal, que consideramos inaplicables a los hechos del caso de autos.

El primer caso en que se debatió esta cuestión fué el de *U. S.* v. *Peters,* 5 Cranch 115 (3 L. Ed. 53), en el que se trataba de recobrar el producto de la venta de un barco, que se encontraba en poder del Tesorero del Estado de Pennsylvania. La corte inferior decidió que el demandante tenía derecho a los fondos, pero se negó a expedir orden de ejecución de sentencia contra el Tesorero basándose en que éste tenía los fondos en su poder como propiedad del Estado, y que como el Estado no podía ser sometido a procedimientos judiciales (*judicial process*) tampoco podía serlo el funcionario que tenía los fondos en representación del Estado. La Corte Suprema expidió auto de *mandamus* para obligar a

la corte inferior a ejecutar su sentencia, expresándose así por voz del Juez Presidente Marshall:

"Al Estado no se le puede hacer parte demandada en una acción incoada por un individuo, pero las Cortes de los Estados Unidos tienen el deber de decidir todos los casos traídos ante ellas por ciudadanos de un Estado contra ciudadanos de otro Estado distinto, cuando un Estado no es necesariamente parte demandada. En este caso la acción no fué instituída contra el Estado o su Tesorero, sino contra los albaceas de David Rittenhouse (el Tesorero) para recobrar el producto de un barco confiscado por la Corte de Almirantazgo, cuyo producto se admitió estaba en poder de ellos. Si estos fondos hubiesen sido realmente propiedad de Pennsylvania, no obstante haber sido ilegalmente adquiridos, el descubrimiento de ese hecho hubiese presentado un caso sobre el cual sería innecesario expresar una opinión; *pero ciertamente nunca podrá alegarse que la mera sugestión de un título a favor de un Estado, sobre propiedad en posesión de un individuo, debe suspender los procedimientos de la Corte e impedir que ésta investigue la sugestión y examine la validez del título.* (Itálicas nuestras.)

En *Meigs* v. *McClung,* 9 Cranch, 11 (3 L. Ed. 639), se trataba de recobrar la posesión de terrenos sobre los cuales los Estados Unidos habían construído edificios militares a un costo de $30,000. Los demandados eran los oficiales militares que estaban en posesión del terreno, quienes alegaron que la acción no podía ser sostenida contra ellos porque el terreno estaba ocupado por tropas de Estados Unidos, para beneficio de los Estados Unidos y en obediencia a sus órdenes. La corte inferior desestimó las objeciones de los demandados y decidió que estando el título a favor del demandante éste podía recobrar la propiedad, y que "Si el terreno era propiedad privada, los Estados Unidos no podían tener la intención de privar a su dueño de ella sin pagarle por la misma una compensación." La Corte Suprema confirmó la sentencia, diciendo:

"Esta Corte es unánime y claramente de opinión que la Corte de Circuito no cometió error al instruir al jurado que el título Indio sobre la propiedad en controversia se había extinguido, y que el demandante en la corte inferior podía sostener su acción."

En el caso de *Osborn* v. *U. S. Bank,* 9 Wheat 738 (6 L. Ed. 204), considerado como el *leading case* sobre la materia, el Estado de Ohio impuso una contribución a una sucursal del banco situada dentro del Estado. Negóse el banco a pagarla y el Auditor del Estado, Osborn, se incautó de $100,000, los que entregó al Tesorero del Estado al enterarse de que la corte había expedido auto de *injunction* para impedir el cobro de tal contribución. El banco dirigió su acción contra el Auditor y el Tesorero. Alegaron éstos que el Estado de Ohio era la parte realmente interesada; que ellos eran funcionarios del Estado, que habían actuado en su carácter oficial y en obediencia a las leyes del Estado y que éste era parte necesaria para el remedio que se solicitaba, o sea la devolución del dinero. Al decidir el caso en favor del banco demandante, la Corte Suprema, por voz del Juez Presidente Marshall, se expresó así:

"Si el Estado de Ohio pudiese haber sido hecho parte demandada, no podría negarse que éste sería un caso fuerte para un *injunction.* La objeción es que, como la verdadera parte no puede ser traída ante la Corte, la acción no puede ser sostenida contra los agentes de esa parte; y se han citado casos para demostrar que una corte de equidad no dictará sentencia a menos que se incluyan como partes demandadas en la acción a todos los que tengan un interés sustancial. Esto es ciertamente así cuando está dentro de las facultades del demandante el incluirlos como partes, pero si la persona que es el verdadero principal, la persona que es la verdadera fuente *del acto malicioso,* en virtud de cuyos poderes y para cuyo beneficio se realizó el acto, estuviese por encima de la ley y exento de procedimientos judiciales, sería contrario a todos los mejores principios ya establecidos el decir que las leyes no pueden proporcionar *contra el agente utilizado para la realización del acto ilegal* los mismos remedios que ellas proporcionarían contra dicho agente si su principal pudiese ser incluído en el pleito....

".... El proceso es sustancialmente, aunque no formalmente, contra el Estado, ...y el interés directo del Estado en el pleito así entablado es admitido; y si el Banco hubiese tenido el poder de hacerlo parte, quizás no debería dictarse sentencia en el caso hasta que el Estado estuviese ante la Corte. Pero el Banco no tenía ese

poder, ...y la muy difícil cuestión que debe ser resuelta es si en un caso·de tal naturaleza la Corte puede actuar sobre los agentes empleados por el Estado y sobre la propiedad en manos de aquéllos.'' (Itálicas nuestras.)

En el caso de *United States* v. *Lee,* 106 U. S. 196 (27 L. Ed. 171), se entabló acción para recobrar la posesión de los terrenos dedicados al Cementerio Nacional, en Arlington. La demanda fué dirigida contra los funcionarios del Gobierno Federal que estaban en posesión de los terrenos, sin que se hiciera parte demandada a los Estados Unidos. La Corte Suprema, después de revisar todas las decisiones anteriores, se expresó así:

''Este examen de los casos en esta Corte establece claramente este resultado: que la proposición de que cuando un individuo es demandado para recobrar propiedades que él posee como funcionario o agente de los Estados Unidos, su posesión no puede ser atacada cuando se llama la atención de la Corte hacia ese hecho, ha sido desestimada y negada en todos los casos en que ha sido necesario decidir esa cuestión''; ...

El examen que hemos hecho de los casos citados por el apelante revela que en todos ellos se trataba de reivindicar propiedades de las cuales los demandantes habían sido desposeídos ilegalmente por funcionarios públicos, quienes al ser demandados alegaron como única defensa que ellos habían actuado bajo la autoridad del Estado y que éste era la parte realmente interesada, contra la cual debía ser dirigida la acción. El *ratio decidendi* en los casos que hemos examinado es que cuando el Estado es parte necesaria en una acción sobre reivindicación de propiedad detentada ilegalmente en su nombre y bajo su autoridad y no da su consentimiento para que se le demande, la acción puede ser dirigida contra los funcionarios que tienen la posesión física de la propiedad, por ser dichos funcionarios *joint tort feasors,* transgresores, conjuntamente con el Estado, de los derechos del dueño de la propiedad que se trata de reivindicar.

En el caso de autos no se trata de reivindicar una propiedad y sí del cumplimiento específico de un contrato celebrado con el demandante por funcionarios públicos, actuando en su capacidad oficial, como agentes del Estado y a nombre y para beneficio de éste. Las dos acciones que aquí se ejercitan son por su naturaleza *ex contractu.* Y esas acciones sólo pueden ser dirigidas contra el Estado, que es la otra parte contratante, y no contra los funcionarios que representaron al Estado en la celebración del contrato o que se negaron a cumplir lo estipulado.

En el caso de *Cunnigham* v. *Macon & B. R. R. Co.,* 109 U. S. 446, 27 L. Ed. 992, se decidió que en aquellos casos en que aparece claramente del récord que el Estado es una parte indispensable para que pueda concederse el remedio solicitado, la corte debe negarse a asumir jurisdicción. La inferencia es, que cuando de la faz del récord aparece que los demandados no tienen un interés individual en la controversia, y que el remedio que contra ellos se pide es solamente en su capacidad oficial, como representantes del Estado, que es el único que va a ser afectado por la sentencia, la cuestión que entonces surge, de si el pleito no es substancialmente un pleito contra el Estado, es una cuestión jurisdiccional. Véanse: *Ex Parte Madrazzo,* 32 U. S. 7 Pet. 627, (8 L. Ed. 808); *Kentucky* v. *Dennison,* 65 U. S. 66 (16 L. Ed. 717); y *New Hampshire* v. *Louisiana,* 108 U. S. 76 (27 L. Ed. 656).

En *Hagood* v. *Southern,* 117 U. S. 52 (29 L. Ed. 805), el Estado de South Carolina, que era la parte realmente interesada, no fué incluído como demandado. La acción fué dirigida contra el Tesorero, el Auditor y otros funcionarios públicos. Al resolver que la acción no podía prosperar, la Corte Suprema Federal dijo:

"Estos pleitos están correctamente descritos como acciones para el cumplimiento específico de un contrato entre los demandantes y el Estado de South Carolina, que son las únicas partes contratantes. Pero en estas demandas el Estado no ha sido mencionado por su nombre como demandado...; y excepto con su consentimiento, no

puede ser traído ante la Corte, ni obligado a comparecer o a defenderse. Y sin embargo, él es la parte real en el alegado contrato, cuyo cumplimiento ha sido ordenado, el que ha sido requerido para cumplir la sentencia y la única parte por quien ésta puede ser cumplida. Aunque nominalmente no es parte del récord, es la verdadera y única parte interesada, los demandados nominales siendo los funcionarios y agentes del Estado, quienes no tienen interés personal en la controversia y se defienden solamente como representantes del Estado. Y las cosas que la sentencia ordena sean hechas y cumplidas por ellos, son las mismas cosas que una vez hechas y cumplidas, constituyen el cumplimiento del alegado contrato por el Estado. El Estado es no solamente la parte verdadera en la controversia, sino también la parte contra la cual se solicita el remedio en la acción, y el pleito está, por lo tanto, sustancialmente dentro de la prohibición de la Enmienda Undécima de la Constitución de los Estados Unidos.''

De la decisión en *Ex parte Ayers* (123 U. S. 443), 31 L. Ed. 216, copiamos lo que sigue:

''¿Podría preguntarse cuál es el verdadero fundamento de la distinción, en tanto la protección de la Constitución de los Estados Unidos es invocada, entre los derechos contractuales del demandante en tal pleito, y otros derechos personales o sobre propiedad? En estos últimos casos se dice que puede ejercitarse la jurisdicción sobre demandados individuales, no obstante el carácter oficial de sus actos, mientras que en los casos de la primera descripción se niega la jurisdicción.

''La distinción, sin embargo, es obvia. Los actos que según se alega en la demanda amenazan realizar los demandados, son violaciones del supuesto contrato entre el Estado de Virginia y los demandantes, solamente en cuanto son considerados como actos del Estado de Virginia. Los demandados, como individuos, no siendo partes en el contrato, no son capaces en derecho de cometer una violación del mismo. No existe remedio para la violación de un contrato, .... excepto sobre el contrato mismo, y entre aquéllos que de acuerdo con la ley son partes contratantes. .... Pero cuando el contrato es entre un individuo y el Estado, no procede acción alguna contra el Estado, y cualquiera acción basada en el contrato, contra demandados que son funcionarios del Estado, el objeto de la cual sea el cumplimiento específico del contrato, obligando a los demandados a hacer aquellas cosas que una vez hechas constituirían el cumplimiento por parte del Estado, o prohibiéndoles hacer aquellas cosas que si fueran

hechas serían meras infracciones del contrato por el Estado, es en substancia una acción contra el Estado mismo, e igualmente dentro de la prohibición constitucional." Véanse: *Louisiana* v. *Jumel,* (107 U. S. 711) 27 L. Ed. 448, 468, y *Pennoyer* v. *McConnaughy,* (140 U. S. 1) 35 L. Ed. 363.

De acuerdo con la jurisprudencia citada, tanto la acción sobre cumplimiento específico del contrato como la de daños y perjuicios por su incumplimiento, son acciones *ex contractu* que deben ser dirigidas contra la otra parte contratante, El Pueblo de Puerto Rico. Si los tres Comisionados aquí demandados en su carácter oficial, no son partes en el contrato y han actuado como meros agentes o mandatarios del Estado, en ese caso la demanda no aduce hechos suficientes para constituir una causa de acción contra ninguno de los tres Comisionados individualmente, ni contra los tres conjuntamente como constituyentes de la División de Hogares Seguros del Departamento del Trabajo de Puerto Rico.

▮ Alega el apelante que la División de Hogares Seguros ha sido convertida por la ley en una corporación o en una *quasi* corporación y no puede, por lo tanto, evadir la responsabilidad de cumplir específicamente sus contratos y la de pagar daños y perjuicios por su incumplimiento. Veamos, pues, si la División de Hogares Seguros del Departamento del Trabajo ha sido investida por la Asamblea Legislativa de Puerto Rico de aquellos poderes y facultades que en derecho tendrían el efecto legal de convertirla en una corporación o *quasi* corporación.

En el caso de *Gross* v. *Kentucky Board of Managers,* 49 S. W. 458 (105 Ky. 840), citado por el apelante, el Estado de Kentucky aprobó una ley para que dicho Estado exhibiese sus productos en la Exposición de Chicago y asignó $100,000 para los gastos de la exhibición. La ley creó una comisión denominada "Board of Managers," para que cumpliese lo dispuesto en el estatuto, con facultades para nombrar agentes y empleados. La Comisión, aun cuando no estaba autorizada para ello, retiró de una vez la suma total asignada. La

Legislatura pasó entonces una Resolución avisando al público que el Estado no asumiría el pago de ninguna obligación que pudiese quedar insoluta después de haberse agotado la asignación ya hecha. El demandante Gross demandó a la Junta para recobrar daños y perjuicios por el incumplimiento de un contrato. La Junta excepcionó la demanda, alegando que la Comisión era un mero agente del Estado, y no podía ser demandada. Al revocar la sentencia por la que se sostuvo dicha excepción, la Corte Suprema de Kentucky se expresó así:

"Es regla bien sentada la de que el Estado no puede ser demandado, y que la misma protección se concede a los funcionarios del Estado. Pero la regla no es aplicable a una corporación creada por el Estado para ciertos fines públicos. . . . La cuestión que se presenta es si la parte apelada fué investida por la legislatura con el carácter de una corporación o *quasi* corporación. No es necesario que la cosa creada por la legislatura sea denominada por ésta 'una corporación.' Su carácter depende de las facultades que le hayan sido conferidas, y no del nombre que la legislatura le haya dado. . . . En el presente caso la legislatura, por la resolución conjunta antes mencionada, declaró expresamente que el Estado no asumiría ninguna de las deudas de la Comisión. Si el Estado no era el deudor, debe haberse contemplado que existía una entidad sobre la cual descansaría la obligación de estos contratos. . . . Pero no puede presumirse que la intención fuera la de que las personas que contrataban con esta Junta no tuvieran a nadie a quien poder exigir el cumplimiento de sus justas reclamaciones. Los Comisionados no eran responsables personalmente de sus obligaciones; el Estado declaró expresamente que no sería responsable; y la única conclusión razonable es que la intención fué que la Junta de Administradores, a la cual se confiaron $100,000 para cumplir los fines de la Ley fuera, hasta el límite de los fondos puestos en sus manos, por lo menos una *quasi* corporación; y como el poder de celebrar contratos le ha sido expresamente conferido, la facultad de demandar o ser demandada sobre dichos contratos fué necesariamente otorgada a dicha Comisión, porque los contratos eran obligaciones de la Comisión, y no obligaciones del Estado. . . . La Comisión era una 'agencia del Estado,' pero estaba investida además de facultades corporativas, y en su capacidad corporativa puede ser demandada por sus actos corporativos lo mismo

que cualquiera otra corporación. . . . La Comisión no fué creada para realizar una función gubernamental. La construcción de un pabellón y la explotación de un restaurante eran asuntos de negocios, con respecto a los cuales esta Junta fué colocada en el mismo plano que otros dedicados a empresas similares. Al enviarla a otro estado distante a realizar tales negocios, y al absolver al Estado de toda responsabilidad, debe presumirse que la intención de la legislatura fué que los fondos en manos de la Comisión quedarían afectados al pago de sus obligaciones.''

Examinaremos ahora las leyes creadoras de la Comisión de Hogares Seguros y de la División de Hogares Seguros en el Departamento del Trabajo de Puerto Rico, para que podamos determinar si el efecto legal de sus disposiciones fué el de crear una corporación o *quasi* corporación facultada para demandar y ser demandada para el cumplimiento específico de sus obligaciones.

La Ley núm. 53 de 11 de julio de 1921, leyes de ese año, página 387, enmendada por la núm. 60 de 1928, por su artículo 1 autorizaba al Comisionado del Interior *para adquirir por compra, con fondos de la Comisión de Hogares Seguros,* aquellos terrenos que fueran seleccionados por él como propios para la formación de granjas agrícolas, y los que fueran seleccionados por él y por el Comisionado de Sanidad como propios para la creación de barriadas obreras. El artículo 2 disponía que la Comisión de Hogares Seguros se compondría del Comisionado del Interior, Presidente *ex officio,* el Tesorero, el Comisionado de Sanidad, el Comisionado de Agricultura y Trabajo y tres personas designadas por el Gobernador; y que dicha Comisión tendría facultad *para adoptar reglas y reglamentos para el arrendamiento, administración y venta de las casas que habían de ser construídas.* Disponía el artículo 3 de dicha ley que todos los fondos procedentes de emisiones de bonos, alquileres u otros ingresos de las casas *serán administrados por El Pueblo de Puerto Rico y constituirán un fondo especial en la Tesorería de Puerto Rico.* Ese fondo fué asignado *para ser invertido por*

*el Comisionado del Interior, con la aprobación de la Comisión
de Hogares Seguros,* en el pago de construcción de casas,.
*compra de terrenos* y otros gastos necesarios para la cons-
trucción de un barrio obrero o venta de granjas agrícolas.
La Comisión fué facultada para distribuir los fondos así
asignados, de acuerdo con las necesidades de cada pueblo o
zona; y para fijar el canon de arrendamiento y el precio de
venta de casas y solares (artículo 4). El Artículo 5 autori-
zaba al Comisionado del Interior, *de acuerdo con la Comisión
de Hogares Seguros,* para arrendar y vender granjas y so-
lares a los trabajadores. El artículo 6 facultaba al Comi-
sionado del Interior *para cambiar o permutar terrenos per-
tenecientes al Pueblo de Puerto Rico por otros más apro-
piados para la construcción de barriadas obreras y granjas
agrícolas y para vender terrenos públicos y con el producto
de la venta adquirir otros para los indicados fines,* y disponía:
''y al efecto se autoriza al Comisionado del Interior para
que efectúe las ventas, compras, cambios o permutas que a
su juicio fueren convenientes y necesarios, con la condición
de que los terrenos que se adquieran de este modo y forma
serán dedicados exclusivamente a cumplir los fines de esta
Ley.'' El artículo 7 autorizaba *al Comisionado del Interior
y a la Comisión de Hogares Seguros* para determinar el
área de los solares que habrían de arrendarse, con derecho
de propiedad, para vivienda o para vivienda y labranza.
Los artículos 8 a 17, ambos inclusive, se refieren exclusiva-
mente al procedimiento a que deberán ajustarse el Comisio-
nado del Interior y la Comisión para el arrendamiento y
venta de solares y granjas, transferencia y anulación de con-
tratos, reversión de terrenos al Pueblo de Puerto Rico por
falta de pago, etc. Las demás disposiciones de la citada
Ley no son pertinentes a la cuestión que hemos de resolver
en el presente caso.

En diciembre 14, 1931, la Asamblea Legislativa de Puerto
Rico aprobó la Ley núm. 4 (Leyes de 1931, Sesión Extraor-

dinaria, pág. 147) por la cual se autorizó al Tesorero de Puerto Rico para emitir bonos de El Pueblo de Puerto Rico hasta la suma de $500,000 y se disponía que el producto de dichos bonos "será invertido por la Comisión de Hogares Seguros en la adquisición de terrenos y destinado a granjas agrícolas bajo las disposiciones de la Ley de Hogares Seguros." Para el pago del principal e intereses de dichos bonos, quedó empeñada la buena fe del Pueblo de Puerto Rico. Los bonos al ser emitidos constituían una obligación legal e ineludible del Pueblo de Puerto Rico hasta que fueran amortizados. La sección 6 disponía que "el producto de la venta de los bonos se depositará con un depositario autorizado del Gobierno de Puerto Rico, con sujeción a las condiciones que prescribiere el Gobernador de Puerto Rico."

En 15 de mayo de 1933, la Asamblea Legislativa de Puerto Rico aprobó la Resolución Conjunta núm. 47, en cuyo preámbulo se hizo constar que era deseable tanto desde el punto de vista de una buena administración, como de la economía, que algunas de las comisiones existentes dentro del Gobierno Insular fueran abolidas y sus funciones transferidas al Departamento con el cual estuvieren relacionadas por la naturaleza de su trabajo; y *que la obra de engrandecimiento social y humano que realizaba la Comisión de Hogares Seguros debe continuarse por el Gobierno de Puerto Rico.* Y de acuerdo con dicho preámbulo se dispuso:

1. Crear la División de Hogares Seguros en el Departamento del Trabajo, la que ejercerá todas las funciones, poderes y deberes que venía ejerciendo la Comisión de Hogares Seguros a virtud de la Ley núm. 53, supra, quedando dicha Comisión abolida.
2. Autorizar a los Comisionados del Trabajo, del Interior y de Sanidad para adquirir por compra con fondos de la Comisión de Hogares Seguros, terrenos para granjas agrícolas y barriadas obreras.
3. Transferir a la División así creada todos los fondos, personal, documentos, archivos, organismos y dependencias administrativas que pertenecieren a la extinta Comisión de Hogares Seguros.
4. Disolver la Comisión de Hogares Seguros.

Somos de opinión que la intención legislativa al aprobar la Ley núm. 53, supra, fué la de organizar la Comisión de Hogares Seguros como una agencia administrativa o cuerpo consultivo del Gobierno para la ejecución y desarrollo del plan que tenía por objeto la formación de granjas agrícolas y la construcción de barriadas obreras. Las facultades de seleccionar y de adquirir por compra terrenos propios para dichas granjas y barriadas y para cambiar o permutar terrenos públicos por otros propios para los fines de la ley, fueron conferidas al Comisionado del Interior y no a la Comisión de Hogares Seguros. Los fondos destinados a cumplir los propósitos de la Ley eran administrados por El Pueblo de Puerto Rico y quedaban bajo la custodia del Tesorero Insular, con el carácter de fondo especial. La facultad de invertir esos fondos se confería al Comisionado del Interior; y a la Comisión solamente se le confirió la facultad de aprobar o desaprobar las inversiones propuestas por el Comisionado. No tenía la Comisión de Hogares Seguros la libertad de acción y la plenitud de facultades necesarias para que podamos sostener que aun cuando no se llamó expresamente "corporación" se le invistió de los atributos inherentes a una entidad corporativa.

Si aceptáramos que la Ley núm. 53 invistió a la Comisión de Hogares Seguros de los atributos de una corporación, esa aceptación en nada ayudaría al apelante. En la fecha en que se radicó la demanda dicha Comisión había dejado de existir y sus funciones habían sido transferidas a una División del Departamento del Trabajo, que es uno de los departamentos ejecutivos del Gobierno Insular y una agencia del Pueblo de Puerto Rico. La intención del legislador fué claramente expresada al decir "esta obra de engrandecimiento social y humano debe continuarse por el Gobierno de Puerto Rico," y al disponer en la Ley Orgánica del Departamento del Trabajo que todo el personal y aquellos organismos y dependencias administrativas de la Comisión de Hogares

Seguros se adscribieran a dicho Departamento, con todo el servicio que prestaba dicha Comisión.

Tanto la División de Hogares Seguros del Departamento del Trabajo, como cada uno de los tres funcionarios ejecutivos aquí demandados, son meros agentes del Pueblo de Puerto Rico, y actúan a nombre y en beneficio de éste y bajo su autoridad para ejercitar una función puramente gubernamental y no para llevar a cabo un negocio como en el caso de *Gross* v. *Kentucky Board of Managers,* supra.

Convenimos con la corte inferior en que las acciones que se ejercitan en este caso debieron ser dirigidas contra El Pueblo de Puerto Rico y no contra sus agentes. Y no habiendo sido emplazado El Pueblo de Puerto Rico, creemos improcedente considerar la cuestión de si éste ha dado o no su consentimiento para ser demandado en acciones de daños y perjuicios por incumplimiento de contratos celebrados por sus agentes.

*La sentencia apelada debe ser confirmada.*

El Juez Asociado Señor De Jesús no intervino.